### DICK *v.* UNITED STATES.

RROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF IDAHO.

No. 62.  Submitted December 3, 1907.—Decided February 24, 1908.

While a State, upon its admission to the Union, is on an equal footing with every other State and, except as restrained by the Constitution, has full and complete jurisdiction over all persons and things within its limits, Congress has power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of the State within whose limits are Indian tribes.

Where fundamental principles of the Constitution are of equal dignity, neither must be so enforced as to nullify or substantially impair the other.

While the prohibition of § 2139, Rev. Stat., as amended in 1892, against introducing intoxicating liquors into Indian country does not embrace any body of territory in which the Indian title has been unconditionally extinguished, that statute must be interpreted in connection with whatever special agreement may have been made between the United States

and the Indians in regard to the extinguishment of the title and the re-
tention of control over the land ceded by the United States.

It is within the power of Congress to retain control, for police purposes, for
a reasonable and limited period, over lands, the Indian title to which is ex-
tinguished, and which are allotted in severalty, notwithstanding that the
Indians may be citizens and the land may be within the limits of a State;
and twenty-five years is not an unreasonable period.

Under the agreement of May 1, 1893, ratified, 28 Stat. 286, 326, between
the United States and the Nez Perce Indians, the United States retained
control over the lands ceded for the purpose of controlling the use of liquor
therein for twenty-five years, and during that period § 2139, Rev. Stat.,
remains in force, notwithstanding such lands are within the State of Idaho.

By indictment returned in the District Court of the United
States for the District of Idaho, the plaintiff in error, Dick, was
charged with the offense of having unlawfully and feloniously
introduced intoxicating liquor, whiskey, into the Indian coun-
try, to wit, into and upon the Nez Perce Indian Reservation,
in the county of Nez Perce, State of Idaho.

The indictment was based upon § 2139 of the Revised Stat-
utes as amended and reënacted by the act of July 23, 1892,
27 Stat. 260, c. 234. That amended section reads: "No ardent
spirits, ale, beer, wine or intoxicating liquor or liquors of what-
ever kind shall be introduced, under any pretense, into the
*Indian country.* Every person who sells, exchanges, gives, bar-
ters or disposes of any ardent spirits, ale, beer, wine or intoxi-
cating liquors of any kind to any Indian under charge of any
Indian superintendent or agent, or introduces or attempts to
introduce any ardent spirits, ale, wine, beer, or intoxicating
liquor of any kind into the *Indian country* shall be punished by
imprisonment for not more than two years, and by fine of not
more than three hundred dollars for each offense. But it shall
be a sufficient defense to any charge of introducing or attempt-
ing to introduce ardent spirits, ale, beer, wine or intoxicating
liquors into the Indian country that the acts charged were
done under authority in writing from the War Department, or
any officer duly authorized thereunto by the War Depart-
ment. . . ."

The accused demurred to the indictment upon the following

among other grounds: That at the time charged in the indictment there was no Indian country within the county of Nez Perce or within the District of Idaho, known or designated as the Nez Perce Indian Reservation; that the jurisdiction of the United States over all the country and territory embraced within the former reservation known and designated as the Nez Perce Indian Reservation was, by the act admitting Idaho as a State into the Union, relinquished to the State of Idaho, excepting only that jurisdiction was retained in the United States over such Indian reservation until the Indians' title to the lands included within the boundary of such reservation should be extinguished; that the Indian or tribal title to the lands therein contained has, since the admission of the State, been extinguished by the allotment of the lands in severalty to the individual Indians and by the purchase of the balance thereof by the United States, and that such allotments and purchase have been ratified by the public laws and acts of Congress; and further, that the former reservation known and designated as the Nez Perce Indian Reservation had, prior to the time of the commission of the acts mentioned in the indictment, been opened for occupation, settlement and disposal under the general land laws of the United States by an act of Congress, and that the same had been, as a matter of general and public knowledge, prior to the time mentioned in the indictment, settled and appropriated by citizens of the State; that various townsites within the boundaries of the former reservation had been settled by citizens and that title thereto transferred from the United States to the inhabitants, and that municipal governments, namely, villages, had been organized and were in existence within the boundaries of the former reservation, and that the same, nor any part thereof, is not, and was not, at the times mentioned in the indictment, Indian country, or lands reserved for the use and occupation of Indians or occupied by any Indian maintaining tribal relations or by any Indians or persons whomsoever over which the United States is exercising, or attempting to exercise, any of the au-

thority or control in nature of the guardianship of the person. Other grounds of demurrer were assigned, but they need not be here set out.

The demurrer was overruled, and the case went to trial, the accused pleading not guilty. At the close of the evidence he asked the court to direct a verdict of not guilty, but that request was denied and the result of the trial was a verdict of guilty. Motions for arrest of judgment and for a new trial having been denied, the defendant was, on May 16, 1905, sentenced to pay a fine of $100 and costs and to be imprisoned in the penitentiary for the term of one year and ten days.

In order that the grounds of the demurrer may be clearly apprehended it is necessary to bring into view certain legislation by Congress and an agreement or treaty made between the United States and the Nez Perce Indians.

By the act of Congress of February 8, 1887, c. 119, providing for the allotment of lands in severalty to Indians on the various Indian reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, it was provided: "That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same, by patent, to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided,* that the President of the United States may in any case, in his discretion, extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above

mentioned, such conveyance or contract shall be absolutely null and void: *Provided*, that the law of descent and partition in force in the State or Territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered, except as herein otherwise provided; . . ." 24 Stat. 389, § 5.

Section 6 of that act is as follows: "That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of the act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

Idaho was admitted into the Union in 1890, act of July 3, c. 656, 26 Stat. 656, the act of admission containing no provision about Indian lands or reservations. But the constitution of Idaho, which Congress accepted, ratified and confirmed, contained this provision: "And the people of the State of Idaho do agree and declare that we forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or

held by any Indians or Indian tribes; and, until the title thereto shall have been extinguished by the United States, the same shall be subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States."

In the act of August 25, 1894, c. 290, 28 Stat. 286, 326, 327, 330, making appropriations for current and contingent expenses of the Indian Department and fulfilling treaty stipulations with various Indian tribes, will be found the provisions of an agreement between the Nez Perce tribe of Indians upon the Lapwai Reservation in Idaho, from which it appears that in making that agreement the parties proceeded under the authority of the above act of 1887. By that agreement the Indians ceded, sold, relinquished and conveyed to the United States all their claim, title and interest in and to all the unallotted lands within the limits of that reservation, except certain specified tracts, which they retained. The parties stipulated that the land so ceded should not be open for public settlement until trust patents for the allotted lands had been duly issued and recorded and the first payment made to the Indians. Article IX of that agreement has a particular bearing upon this case. It reads: "It is further agreed that the lands by this agreement ceded, those retained, and those allotted to the said Nez Perce Indians, shall be subject for a period of twenty-five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country, and that the Nez Perce Indian allottees, whether under the care of an Indian agent or not, shall, for a like period, be subject to all the laws of the United States prohibiting the sale or other disposition of intoxicants to Indians." The agreement by its terms was not to take effect and be in force until ratified by Congress. It was accepted, ratified and confirmed by the above act of August 25, 1894, c. 290.

*Mr. Frank E. Fogg* for plaintiff in error:

The United States has no jurisdiction for the purposes of

local police control over territory within a State owned in fee by white citizens of, such State, and not reserved for use and occupancy by Indians, nor for any government purpose whatsoever. In the present case the sale of liquor was made in a municipal territory clearly within the jurisdiction of the State and outside the jurisdiction of the United States. In these police matters there is no such thing as a divided sovereignty and jurisdiction is vested entirely either in the State or the Nation, and not divided between the two. See *In re Heff*, 197 U. S. 505, which controls this case, in which there exist even stronger reasons for denying to the United States jurisdiction in the premises, because even if the statute in question could be held constitutional, the acts charged do not constitute an offense under the statute.

The acts of Congress under which plaintiff in error was indicted exclude entirely lands that the Government had patented to white citizens without any restrictions whatsoever. By the very terms of the act under which the plaintiff in error was charged, even if the same could be held constitutional, the lands included within the village of Culdesac, the title to which had passed from the United States without restriction, are excluded from the term "Indian country," as contained in said act.

Congress by the act of ratifying the agreement with the Nez Perces, could not place any restrictions upon future legislation, amending or even abrogating the existing law in reference to the prohibition of the introduction of liquor.

The plenary power of Congress over tribal relations and lands cannot be limited by provisions of treaty so as to preclude future enactments, giving effect to the government policy in relation thereto. *Lone Wolf v. Hitchcock*, 187 U. S. 553.

The effect and purpose of the agreement of May 1, 1893, with the Nez Perces was to break up the tribal relations; in fact, the United States, by the act of ratifying the said agreement with the Nez Perces, not only renounced its guardianship of the person and general property of every Indian of the former

Nez Perce tribe, but practically destroyed the very machinery by which the Indians could govern themselves. Unless the sixteen hundred Indians immediately become full citizens of the State of Idaho, and, in fact, subject to all its laws, both civil and criminal, upon the acceptance of land in severalty, as provided by the act of February 8, 1887, then they are without government or means of government; their political and civil status is an anomaly suspended in the air between the sovereignty of the State and the sovereignty of the Nation.

There is no such thing as qualified citizenship, for Congress cannot confer upon the Indians such citizenship as would entitle them to all the rights of citizens of the State where they were located, and at the same time deny to the State the right to subject them to the same complete and exclusive police control that it has over its other citizens. *In re Celestene,* 114 Fed. Rep. 551–553; *In re Now-goe-Zhuck,* 76 Pac. Rep. 877–880.

The contention of the Government that the United States has jurisdiction because of a clause in the treaty or agreement with the Nez Perce Indians ratified May 1, 1893, providing that the laws of the United States prohibiting the introduction of liquor into the Indian country shall remain in force over the land ceded for a period of twenty-five years, is entirely untenable. Congress was without constitutional authority to authorize such an agreement with the Indians or to ratify the clause in question. The effect of such an agreement would be to establish a divided sovereignty of certain definite territory and deprive the State of full police control of its own citizens within its own territory. It would seem, further, that in so far as it attempted to provide for the future police control of the territory ceded, that the clause is void for the additional reason, that it amounts to the Government bartering with its own citizens to place a limitation upon its future policy in regard to matters of mere police regulation. *Boyd* v. *Alabama,* 94 U. S. 650; *New York & N. E. E.* v. *Bristol,* 151 U. S. 567; *Holden* v. *Hardy,* 169 U. S. 392.

·*The Attorney General* and ·*Mr. William R. Harr*,· Special Assistant to the Attorney General, for defendant in error:

The *Heff Case*, 197 U. S. 488, is not controlling. The question there was as to the authority of Congress, *after* an Indian allottee had been made a citizen and put under the jurisdiction of the State, to exercise certain police jurisdiction over him. Here the question is as to the authority of Congress *before* that took place—if it has ever taken place—to reserve a limited jurisdiction over the ceded territory. In this case the matter of citizenship and subjection to state authority, and not the jurisdiction retained by Congress, is really in issue.

It was competent for Congress to stipulate that the lands ceded by the Nez Perces should be subject for a definite period to the laws of the United States regulating the introduction of liquor into the Indian country.

At the time the agreement of May 1, 1893 was made and ratified the Nez Perce Indian Reservation, being lands to which the Indian title had not been extinguished, was clearly Indian country within the meaning of the laws of the United States. By article IX of the agreement it is, in effect, declared that it shall continue to be Indian country for a period of twenty-five years. The authority of Congress so to provide is settled by the decisions of this court. *Bates* v. *Clark*, 95 U. S. 204; *United States* v. *Forty-three Gallons of Whiskey*, 93 U. S. 197, 198.

Even though the Nez Perces, having since received their allotments, should be held to be, by virtue of the act of February 8, 1887, citizens of the United States and subject to the laws of the State of Idaho, that fact does not necessarily impair the jurisdiction expressly retained by Congress to regulate the introduction of intoxicants upon the ceded lands for a specified period.

The stipulation in the agreement to that effect being within the competency of Congress, under the decision in the case last cited, notwithstanding the lands were embraced within the limits and general jurisdiction of the State, a subsequent·

change in the political status of one or all of the Indians should not impair the validity of the stipulation or relieve the United States from its obligation or power to enforce it.

The power of Congress to make treaties with the Indian tribes is coextensive with its power to make treaties with foreign nations. *United States* v. *Forty-three Gallons of Whiskey,* 93 U. S. 197, 198.

It is true that in the present case we have not a treaty made by the President by and with the consent of the Senate, but simply an agreement negotiated in pursuance of and ratified by act of Congress approved by the President. That fact seems, however, immaterial. The power of the United States to deal with the Indians is the same whether exercised by law or treaty. A treaty has no superior force or sanctity to an act passed in pursuance of the Constitution. Both are equally declared to be the supreme law of the land, anything in the constitution or laws of any State to the contrary notwithstanding. An act of Congress may repeal a treaty, and *vice versa.* *Foster* v. *Neilson,* 2 Pet. 253; *Chae Chan Ping* v. *United States,* 130 U. S. 581.

Congress may provide for the dissolution of Indian tribal governments and the incorporation of the Indians as citizens of the United States. In so doing it may attach conditions to its grant of citizenship. Its power in this respect is as broad and untrammeled as the power to admit new States into the Union. Qualified citizenship is not inconsistent with the provisions of the Constitution. *United States* v. *Rickert,* 188 U. S. 432; *In re Heff,* 197 U. S. 509.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

From the above statement it appears:

That the lands allotted in severalty to Indians in conformity with the act of February 8, 1887, were to be held for the period of twenty-five years by the United States in trust for the sole

use and benefit of the Indian allottee or his heirs, when a formal patent was to be issued by the United States to the Indian or his heirs in fee, free from all charge or incumbrance whatever—such period subject to be extended by the President in his discretion;

That upon the completion of the allotments and patenting of the lands to the allottees, as in that act provided, every member of the respective bands or tribes of Indians to whom allotments have been made was to have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which he resided; also, that every Indian born within the United States, to whom an allotment was made under the act of 1887 or under any treaty, and every Indian born within the United States who had voluntarily taken up within such limits his residence separate and apart from any Indian tribe and adopted the habits of civilized life, was declared to be a citizen of the United States and entitled to all the rights, privileges or immunities of such citizens; and,

That by the agreement of 1893 with the Indians the lands thereby ceded, those retained, *and* those allotted to the Nez Perce Indians, were to be subject for the period of twenty-five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country, and that the Nez Perce Indian allottees, whether under the care of an Indian agent or not, should for a like period be subject to all the laws of the United States prohibiting the sale or other disposition of intoxicants to the Indians. It also appears that at the date of such agreement it was made an offense against the United States, punishable by fine and imprisonment, for any one either to sell, exchange, give, barter or dispose of ardent spirits, ale, beer, wine or intoxicating liquor of any kind to any Indian under charge of an Indian superintendent or agent, or to introduce or attempt to introduce ardent spirits, ale, beer, wine or intoxicating liquor of any kind into the Indian country.

There are certain facts which the accused insists are decisive in his favor. They are as follows:

1. That the village of Culdesac, although within the bound-
aries of the Nez Perce Reservation as established before Idaho
was admitted into the Union, was, at the time specified in the
indictment, an organized village or town of that State.

2. The accused, Dick, is a Umatilla Indian who, at the date
of the offense, held and for three years had held an allotment
in severalty and also what is called a trust patent. On or about
the thirteenth of March, 1905, he purchased at Culdesac five
bottles of whiskey, the contents of two bottles of which he
and some other Indians drank up. Part of the money paid for
the whiskey was furnished by Te-We-Talkt, a Nez Perce In-
dian, living on the Nez Perce Reservation and holding an
allotment and also a preliminary trust patent. Dick gave one
bottle of the whiskey to Te-We-Talkt, but afterwards it was
taken from the latter by the superintendent and acting agent
of the Nez Perce Indians. The purchasing of the whiskey, the
giving of the one bottle to Te-We-Talkt and the taking of that
bottle from the latter all occurred within the limits of the vil-
lage of Culdesac. Nothing happened in relation to the transac-
tion outside of the village. The superintendent of the Nez
Perce Indians testified: "I do not know of any reservation or
any part of the reservation used for Government purposes or
for Indian purposes within the boundary of the village of Cul-
desac. I have no idea there is any such reservation within such
village. Culdesac is seven or eight miles from the exterior
boundaries of the Indian school reservation."

3. The lands upon which the village of Culdesac is located
were part of those ceded to the United States by the agreement
of 1893 with the Indians, and before the above transaction in
that village about whiskey occurred the title to such lands had
passed by patent from the United States under the townsite
laws to the probate judge of Nez Perce County, in trust for
the inhabitants of the village. 141 Fed. Rep. 5, 7.

We need not stop to consider the scope, meaning or validity
of that part of amended § 2139 of the Revised Statutes, which
makes it an offense against the United States to sell, exchange,

give, barter or dispose of ardent spirits, ale, beer, wine or intoxicating liquors "to any Indian under charge of any Indian superintendent or agent." No case is here for trial under that clause of the statute; for, the only charge in the indictment is that the accused unlawfully and feloniously introduced intoxicating liquors into the "Indian country."

Section 2139, as amended and reënacted in 1892, makes it an offense against the United States for any one to introduce intoxicating liquors into the "Indian country," and the offense charged against Dick was the introduction by him of whiskey into that country on the fifteenth day of March, 1905. The transaction out of which the present prosecution arose occurred, as we have seen, within the village of Culdesac, a municipal organization existing under and by virtue of the laws of Idaho, and the parties involved in it were Dick and Te-We-Talkt, who were at that time Indian allottees in severalty and holders of trust patents, and therefore, according to the decision in *Matter of Heff*, 197 U. S. 488, citizens of the United States. If this case depended *alone* upon the Federal liquor statute forbidding the introduction of intoxicating drinks into the Indian country, we should feel obliged to adjudge that the trial court erred in not directing a verdict for the defendant; for that statute, when enacted, did not intend by the words "Indian country" to embrace any body of territory in which, at the time, the Indian title had been extinguished, and over which and over the inhabitants of which (as was the case of Culdesac) the jurisdiction of the State, for all purposes of government, was full and complete. *Bates* v. *Clark*, 95 U. S. 204; *Ex parte Crow Dog*, 109 U. S. 556, 561.

But this case does not depend upon the construction of the Federal liquor statute, considered alone. That statute must be interpreted in connection with the agreement of 1893 between the United States and the Nez Perce Indians. By that agreement, as we have seen, the United States stipulated that the lands ceded by the Nez Perce Indians, and those retained as well as those allotted to the Indians (which embraced all

the lands in the original Reservation), should be subject, for the limited period of twenty-five years, to all Federal laws prohibiting the introduction of intoxicants into the Indian country.

Now, the principal contention of the accused is that the United States has no jurisdiction for purposes of local police control over lands within a State which are owned in fee by white citizens of such State, although they may have been once the property of an Indian tribe and were acquired by the United States subject to the condition that the acts of Congress, relating to a named subject, should remain in force, for a prescribed period, over such territory. We could not allow this view to control our decision without overruling former decisions, the correctness of which, so far as we are aware, has never been questioned. In determining the extent of the power of Congress to regulate commerce with the Indian tribes, we are confronted by certain principles that are deemed fundamental in our governmental system. One is that a State, upon its admission into the Union, is thereafter upon an equal footing with every other State and has full and complete jurisdiction over all persons and things within its limits, except as it may be restrained by the provisions of the Federal Constitution or by its own constitution. Another general principle, based on the express words of the Constitution, is that Congress has power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of any State within whose limits are Indian tribes. These fundamental principles are of equal dignity, and neither must be so enforced as to nullify or substantially impair the other. In regulating commerce with Indian tribes Congress must have regard to the general authority which the State has over all persons and things within its jurisdiction. So, the authority of the State cannot be so exerted as to impair the power of Congress to regulate commerce with the Indian tribes.

At the date of the agreement of 1893 with the Nez Perce Indians the Reservation upon which they lived was their

property, and they and their lands were subject to Federal
jurisdiction, although the lands of that Reservation were
within the limits of the State of Idaho which had been previ-
ously admitted into the Union upon an equal footing with other
States. The future of those lands was a matter to be deter-
mined primarily between the Indians owning them and the
United States under whose exclusive jurisdiction, at that time,
were both the Indians and their lands. The Indians—such is
the fair interpretation of the agreement—desired to retain
some of their lands, but were willing to cede a part of them
to the United States to be allotted in severalty to men of their
tribe, provided the lands then constituting the reservation,
"those ceded, those retained, *and* those allotted" to the Nez
Perce Indians, were protected by the Federal laws prohibiting
the introduction of intoxicants into the Indian country. We
may assume that they particularly had in mind the lands
allotted in severalty, because the allottees, after receiving
preliminary trust patents, would become citizens of the United
States, and it was necessary that the Indians, remaining on
the unallotted and retained lands, should be protected against
the pernicious influences that would come from having the
allotted lands used by citizens of the United States as a store-
house for intoxicants. Only the authority of the United
States could have adequately controlled the conduct of such
citizens. If intoxicants could be kept upon the lands of the
allottees in severalty, it is easy to perceive what injury would
be done to the Indians living on the other lands, who, in order
to obtain intoxicating liquor, could go regularly or frequently
to the places near by, on some allotted lands, where intoxicants
were stored for sale or exchange. Therefore, the provision in
the agreement, by which the lands allotted in severalty, as
well as those retained and ceded, were made subject (not for
all time, but only for a limited period, reasonable in duration)
to any Federal statute forbidding the introduction of intoxi-
cants into the Indian country, was one demanded by the high-
est considerations of public policy, whether we look to the

proper government of the Indian tribes by the United States or to the safety and happiness of the Indians themselves.

This question, as to the validity of Article IX of the agreement of 1893, is, we think, concluded by principles announced in former decisions in this court. A leading case is that of *United States* v. *Forty-three Gallons of Whiskey &c.,* 93 U. S. 188, 193, 195, 197. That was a libel of information by the United States against a lot of whiskey seized and sought to be forfeited by virtue of an act of Congress, approved June 30, 1834, and amended March 15, 1864. The liquors were introduced into an organized village of the State of Minnesota, which village was located upon territory that had been ceded to the United States by a treaty made in 1863 and proclaimed in 1864 with certain bands of Indians. The case proceeded upon the ground that the carrying of the whiskey into the Minnesota village was in violation of an existing act of Congress, making it a crime to introduce spirituous liquors or wines into the "Indian country." The treaty with the Indians, which was involved in that case, provided that the statutes of the United States prohibiting the introduction and sale of spirituous liquors into the Indian country should be the law throughout all the country ceded, until otherwise directed by Congress or the President. In that case the contention was that the place where the whiskey was found was not Indian country; that it ceased to be such when the territory was transferred to the United States; and that the extension, by force alone of the Indian treaty, of the Federal laws relating to lands in an organized county of the State was an infringement of the State's lawful jurisdiction and an invasion of its sovereignty, the State having been admitted into the Union upon an equal footing with the original States.

This court said: "The Red Lake and Pembina bands of Chippewa Indians ceded to the United States, by treaty, concluded October 2, 1863, a portion of the lands occupied by them, reserving enough for their own use. The seventh article is in these words 'The laws of the United States now in force,

or that may hereafter be enacted, prohibiting the introduction
and sale of spirituous liquors in the Indian country, shall be
in full force and effect throughout the country hereby ceded
until otherwise directed by Congress or the President of the
United States.' The ceded country is now part of an organized
county of the State of Minnesota; and the question is, whether
the incorporation of this article in the treaty was a rightful
exercise of power. If it was, then the proceedings to seize and
libel the property introduced for sale in contravention of the
treaty were proper, and must be sustained. Few of the re-
corded decisions of this court are of greater interest and im-
portance than those pronounced in *The Cherokee Nation* v.
*The State of Georgia,* 6 Pet. 1, and *Worcester* v. *The State of
Georgia,* 6 Pet. 515. Chief Justice Marshall, in these cases, with
a force of reasoning and an extent of learning rarely equalled,
stated and explained the condition of the Indians in their
relation to the United States and to the States within whose
boundaries they lived; and his exposition was based on the
power to make treaties and regulate commerce with the Indian
tribes. Under the Articles of Confederation, the United States
had the power of regulating the trade and managing all affairs
with the Indians not members of any of the States; provided
that the legislative right of a State within its own limits be not
infringed or violated. Of necessity, these limitations rendered
the power of no practical value. This was seen by the conven-
tion which framed the Constitution; and Congress now has the
exclusive and absolute power to regulate commerce with the
Indian tribes—a power as broad and as free from restrictions
as that to regulate commerce with foreign nations. The only
efficient way of dealing with the Indian tribes was to place
them under the protection of the general government. Their
peculiar habits and character required this; and the history
of the country shows the necessity of keeping them 'separate,
subordinate, and dependent.' Accordingly, treaties have been
made and laws passed separating Indian territory from that
of the States, and providing that intercourse and trade with

the Indians should be carried on solely under the authority of the United States. Congress very early passed laws relating to the subject of Indian commerce, which were from time to time modified by the lessons of experience. . . . . This power is in nowise affected by the magnitude of the traffic or the extent of the intercourse. As long as these Indians remain a distinct people, with an existing tribal organization, recognized by the political department of the Government, Congress has the power to say with whom, and on what terms, they shall deal and what articles shall be contraband. If liquor is injurious to them inside of a reservation, it is equally so outside of it, and why cannot Congress forbid its introduction into a place *near by, which they would be likely to frequent?* It is easy to see that the love of liquor would tempt them to stray beyond their borders to obtain it, and that bad white men, knowing this, would carry on the traffic in adjoining localities, rather than venture upon forbidden ground. If Congress has the power, as the case we have last cited decides, to punish the sale of liquor anywhere to an individual member of an Indian tribe, why cannot it also subject to forfeiture liquor introduced for an unlawful purpose into territory in proximity to that where the Indians live? There is no reason for the distinction; and, as there can be no divided authority on the subject, our duty to them, our regard for their material and moral well-being, would require us to impose further legislative restrictions, should country adjacent to their reservations be used to carry on the liquor traffic with them."

After referring to *United States* v. *Holliday,* 3 Wall. 409, in which it was held that Congress could regulate commerce with the individual members of Indian tribes, the court proceeded: "The chiefs doubtless saw, from the curtailment of their reservation and the consequent restriction of the limits of the 'Indian country' that the ceded lands would be used to store liquors for sale to the young men of the tribe; and they well knew that, if there was no cession, they were already sufficiently protected by the extent of their reservation. Under such cir-

cumstances it was natural that they should be unwilling to sell until assured that the commercial regulation respecting the introduction of spirituous liquors should remain in force in the ceded country, until otherwise directed by Congress or the President. This stipulation was not only reasonable in itself, but was justly due from a strong Government to a weak people it had engaged to protect. It is not easy to see how it infringes upon the position of equality which Minnesota holds with the other States. The principle that Federal jurisdiction must be everywhere the same, under the same circumstances, has not been departed from. The prohibition rests on grounds which, so far from making a distinction between the States, apply to them all alike. The fact that the ceded territory is within the limits of Minnesota is a mere incident; for the act of Congress imported into the treaty applies alike to all Indian tribes occupying a particular country, whether within or without state lines. Based, as it is, exclusively on the Federal authority over the *subject-matter*, there is no disturbance of the principle of state equality."

The result in that case was that the whiskey was forfeited because illegally introduced in violation of the treaty with the Indians, and this notwithstanding the place at which it was found and seized was within a State.

In *Bates* v. *Clark*, 95 U. S. 204, 208, 209, the court said that Indian lands ceased, without any further act of Congress, to be Indian country after the Indian title had been extinguished, but it took care to add the qualifying words, "unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case." Referring to the treaty involved in the case of the *Forty-three Gallons of Whiskey*, the court further said: "When this treaty was made, in 1864, the land ceded was within the territorial limits of the State of Minnesota. The opinion holds that it was Indian country before the treaty, and did not cease to be so when the treaty was made, *by reason of the special clause to the contrary in the treaty, though within the boundaries*

*of a State.* It follows from this that all the country described by the act of 1834 as Indian country remains Indian country as long as the Indians retained their original title to the soil, and ceases to be Indian country whenever they lose that title, *in the absence of any different provision by treaty or by act of Congress.*" See also *Ex parte Crow Dog,* 109 U. S. 556, 561.

Following our former decisions, we adjudge that the agreement between the United States and the Nez Perce Indians, whereby the Indian lands ceded, retained and allotted to the Nez Perce Indians, should be subject (not without limit as to time, but only for twenty-five years) to any Federal statutes prohibiting the introduction of intoxicants into the Indian country, was not liable to objection on constitutional grounds; in which case the demurrer to the indictment was properly overruled, and the plaintiff in error rightfully convicted.

In view of some contentions of counsel and of certain general observations in the case of *Forty-three Gallons of Whiskey,* above cited, not necessary to the decision of that case, but upon which some stress has been laid, it is well to add that we do not mean, by anything now said, to indicate what, in our judgment, is the full scope of the treaty-making power of Congress, nor how far, if at all, a treaty may permanently displace valid state laws or regulations. We go no further in this case than to say that the requirement, in the agreement of 1893, that the Federal liquor statutes protecting the Indian country against the introduction of intoxicants into it should, for the limited period of twenty-five years, be the law for the lands ceded and retained by, as well as the lands allotted to, the Nez Perce Indians, was a valid regulation based upon the treaty-making power of the United States and upon the power of Congress to regulate commerce with those Indians, and was not inconsistent, in any substantial sense, with the constitutional principle that a new State comes into the Union upon entire equality with the original States. The judgment must, for the reasons stated, be affirmed.

*It is so ordered.*