Peelle, Ch. J.,
delivered the opinion of the court:
By the special act set out in Finding X jurisdiction is conferred upon the court, with the right of appeal, “ to determine the validity of any acts of Congress passed ” since the act of July 1, 1902 (32 Stat. L., 716), “ in so far as said acts, or any of them, attempt to increase or extend the restrictions upon alienation, encumbrance, or the right to lease the allotments of lands of Cherokee citizens ” enrolled as of September 1,1902, in accordance with said act July 1, 1902.
The importance of the case can hardly be overstated. It involves the power of Congress, after allotments have been made in severalty under the provisions of said act, with certain restrictions against alienation, encumbrance, and leasing, to increase or enlarge such restrictions by subsequent legislation. The decision, the defendants assert, “ will affect not only the allotments of 8,689 Cherokee full bloods directly concerned in this case, but indirectly all of the Five Civilized Tribes of Oklahoma, numbering perhaps 30,000 persons.”
*298 The character of the title to the lands held by the Cherokees was considered by the court in the recent case of Muskrat and Dick (ante, p. 166), holding, on the authorities there cited, that whatever of title was conveyed by the United States by the patent of December 31, 1838, “ was conveyed to the Cherokees as a nation,” no title being vested in severalty in any of them (Cherokee Trust Fund, 117 U. S., 288; Cherokee Nation v. Hitchcock, 187 U. S., 294, 307). The title so conveyed was subject to the conditions that the tribe should not become extinct or abandon possession of the lands, and as neither of the conditions named had happened when the allotment act of July 1, 1902, was passed, the title remained in the nation for the benefit of all its members, and will continue to be so held until divested by the United States.
The act of July 1,1902, ratified by the Cherokees by popular vote, imposed for their protection the restrictions set forth, as follows:
“ Seo. 13. Each member of said tribe shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to forty acres of the average allottable lands of the Cherokee Nation, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the certificate of allotment. Separate certificate shall issue for said homestead. During the time said homestead is held by the allottee the same shall be nontaxable and shall not be liable for any debt contracted by the owner thereof while so held by him.
“ Sec. 14. Lands allotted to citizens shall not in any manner whatever or at any time be encumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act.
“ Sec. 15. All lands allotted to the members of said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent.
“ Sec. 16. If for any reason an allotment should not be selected or a homestead designated by or on behalf of any member of the tribe, it shall be the duty of said commission to make said selection and designation.
“ Sec. 20. If any person whose name appears upon the roll prepared as herein provided shall have died subsequent to *299 the first day. of September, nineteen hundred and two, and before receiving his allotment, the lands to which such person would have been entitled if living shall be allotted in his name, and shall, with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided'in chapter forty-nine of Mansfield’s Digest of the Statutes of Arkansas: Provided, That the allotment thus to be made shall be selected by a duly appointed administrator or executor. If, however, such administrator or executor be not duly and expeditiously appointed, or fails to act promptly -when appointed, or for any other cause such selection be not so made within a reasonable and proper time, the Dawes Commission shall designate the lands thus to be allotted.
“ Sec. 21. Allotment certificates issued by the Dawes Commission shall be conclusive evidence of the right of an allottee to the tract of land described therein, and the United States Indian agent for the Union Agency shall, under the direction of the Secretary of the Interior, upon the application of the allottee, place him in possession of his allotment, and shall remove therefrom all persons objectionable to him, and the acts of the Indian agent hereunder shall not be controlled by the writ or process of any court.
“ Sec. 72. Cherokee citizens may rent their allotments when selected for a term not to exceed one year for grazing purposes only and for a period not to exceed five years for agricultural purposes, but without any stipulation or obligation to renew the same; but leases for a period longer than one year for grazing purposes and for a period longer than five years for agricultural purposes, and for mineral purposes, may also be made with the approval of the Secretary of the Interior, and not otherwise. Any agreement or lease of any kind or character violative of this section shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its invalidity. Cattle grazed upon leased allotments shall not be liable to any tribal tax, but when cattle are introduced into the Cherokee Nation and grazed on lands not selected as allotments by citizens the Secretary of the Interior shall collect from the owners thereof a reasonable grazing tax for the benefit of the tribe, and section twenty-one hundred and seventeen of the Revised Statutes of the United States shall not hereafter apply to Cherokee lands.”
By the act of March 11, 1904 (38 Stat. L., pt. 1, p. 65), the Secretary of the Interior was “ authorized and empowered ” to grant a right of way for the construction of pipe lines for *300 the conveyance of oil and gas through any lands held by an Indian tribe or nation in the Indian Territory, and through lands allotted in severalty to individual Indians, “ which have not been conveyed to the allottee with full power of alienation,” for a period not exceeding twenty years, with the right of renewal for a like period at the expiration thereof, upon such terms as the Secretary of the Interior may determine. As the lands allotted under the act of July 1,1902, have not “ been conveyed with full power of alienation,” as shown by the sections of the act quoted, the authority of the Secretary of the Interior to grant such rights of way extend and apply to the lands so allotted and conveyed.
While the act of March 11,1904, does not fall strictly within the letter of the jurisdictional act “ to increase or extend the restrictions upon alienation, incumbrance, or the right to lease the allotments of lands of Cherokee citizens,” imposed by the act of July 1, 1902, it was passed since that date; and if it does not “ attempt to increase or extend the restrictions ” so imposed, it will necessarily operate against alienation as well as against the freedom of the allottees to incumber or lease such allotments, and, therefore, we will consider it in connection with the subsequent acts to which objection is made.
Thereafter the act of April 26, 1906 (34 Stat. L., 137), sections 19, 20, and 22, provides:
“ Sec. 19. That no full-blood Indian of the Choctaw, Chickasaw, Cherokee', Creek, or Seminole tribes shall have power to alienate, sell, dispose of, or encumber in any manner any of the lands allotted to him for a period of twenty-five years from and after the passage and approval of this act, unless such restriction shall, prior to the expiration of said period, be removed by act of Congress; and for all purposes the quantum of Indian blood possessed by any member of said tribes shall be determined by the rolls of citizens of said tribes approved by the Secretary of the Interior: Provided, however, That such full-blood Indians of any of said tribes may lease any lands other than homesteads for more than one year, under such rules and regulations as may be prescribed by the Secretary of the Interior; and in case of the inability of any full-blood owner of a homestead, on account of infirmity or age, to work or farm his homestead, the Secretary of the Interior, upon proof of such inability, *301 may authorize the leasing of such homestead under such rules and regulations: Provided further, That conveyances heretofore made by members of any of the Five Civilized Tribes subsequent to the selection of allotment and subsequent to removal of restriction, where patents thereafter issue, shall not be deemed or held invalid solely because said conveyances were made prior to issuance and recording or delivery of patent or deed; but this shall not be held or construed as affecting the validity or invalidity of any such conveyance, except as hereinabove provided; and every deed executed before, or for the making of which a contract or agreement was entered into before the removal of restrictions be, and the same is hereby, declared void: Provided further, That all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee.
“ Sec. 20. That after the approval of this act all leases and rental contracts, except leases and rental contracts for not exceeding one year for agricultural purposes for lands other than homesteads, of full-blood allottees of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes shall be in writing and subject to approval by the Secretary of the Interior and shall be absolutely void and of no effect without such approval: Provided, That allotments of minors and incompetents may be rented or leased under order of the proper court: Provided further, That all leases entered into for a period of more than onp year shall be recorded in conformity to the law applicable to recording instruments now in force in said Indian Territory.”
“ Sec. 22. That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in case of the organization of a State or Territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed, by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may 'prescribe.”
For the purpose of carrying into effect the provisions of said sections the Secretary of the Interior, in July, 1906, and *302 thereafter, prepared and promulgated necessary regulations whereby the sale and leasing of lands allotted to or inherited by full-blood Indians of the Five Civilized Tribes are to be governed.
By an amended petition filed March 26, 1908, long after the time fixed by the jurisdictional act for the commencement of suit, the claimants attack a provision in said jurisdictional act (March 1, 1907, p. 1025), charging the lands allotted to full-blood Cherokees with clerical expenses connected with the leasing of such allotments for mineral and other purposes; but as that provision clearly is not covered by the language of the jurisdictional act inspecting the extension of the restrictions upon alienation, incumbrance, or the right to lease allotments, we will not consider it further than to say that the money so used was reimbursed before the filing of the amended petition herein, and it has since been omitted in the appropriation act of April 30, 1908 (35 Stat. L., 70-90) ; and besides it can hardly be said that Congress intended the court to consider the validity of the provision in the same act that contained the jurisdictional clause.
The question as to the validity of the act of April 26,1906, as amended by the act of June 21, 1906 — to apply to the Cherokees — so far as said act attempts “ to increase the number of persons entitled to share ” in the common property beyond those enrolled for allotment as of September 1, 1902, under the act of July 1, 1902, was considered in the Muskrat case, sufra. The decision on the authorities there cited was based on the continued existence, by various acts of Congress, of the tribal government of the Cherokee Nation; and inasmuch as the act under which allotments were made in that case provided for the continued existence of the tribal government until March 4, 1906, the court held that Congress had the power to extend the time for the completion of the roll so as to embrace all Cherokee citizens living on that date.
As the common property was held by the nation for the mutual benefit of the communal owners, their rights in the common property continued so long as the tribal government existed. The tribal government having been continued beyond the time fixed in the act of July 1, 1902, for allotment, *303 those born after September 1, 1902, were denied the right to share in the allotments under that act, though living on March 4, 1906. But the moment they were born their communal rights attached to the unallotted lands. True, those to whom allotments had been made continued communal owners in the same lands, their rights thereto not having been relinquished under the act of July 1, 1902. But Congress having seen fit to continue the tribal government to March 4, 1906, by the same act which .authorized the allotments, the allot-tees were bound to take notice thereof; and they, having-under that act acquired their rights to the exclusion of those born after September 1, 1902, are in no condition to complain if their communal interest in such unallotted lands and undistributed funds be taken to equalize the allotments to all those so born who were living on March 4, 1906. Only by this method could Congress have provided for the equalization of allotments to March 4, 1906, and we held that the power was lodged in Congress to make it.
In the present case the question is somewhat different from that, as it involves the power of Congress, after imposing restrictions against alienation and leasing of allotments to all alike for a fixed time, to extend such restrictions as against the lands allotted to a segregated class designated as “ full-blood Indians ” of the Cherokee and other civilized tribes.
In the act of July 1, 1902, section 13, the allottee is prohibited from alienating his homestead, taken as part of his allotment, during his lifetime, not exceeding twenty-one years, during which time the allotment is nontaxable and free from debts contracted while so held by the owner.
By section 14 it is provided that the lands allotted to citizens shall not be incumbered or sold to satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of the act. And by section 15 it is provided that all lands allotted to members of the tribe, except the lands selected for homesteads, “ shall be alienable in five years after issuance of patent.” Section 16 gives the commission authority to select allotments and designate homesteads for those who for any reason fail to do so.
*304 By the act of April 26, 1906, sections 19 and 20, it is provided, in substance, that no full-blood Indian of the Five Civilized Tribes “ shall have power to alienate, sell, dispose of, or incumber in any manner any of the lands allotted to him for a period of twenty-five years ” from and after the passage of the act, unless such restrictions be removed by Congress prior to the expiration of such period. And section 19 declares that “ for all purposes the quantum of Indian blood possessed by any member of said tribes shall be determined by the rolls of citizens of said tribes approved by the Secretary of the Interior.”
Bight is given by section 20 to full-blood Indians to lease, in writing, with the approval of the Secretary of the Interior, their allotments, other than their homesteads, for one year; and if for a longer period, the lease to be recorded in conformity with the laws of the Indian Territory.
Provision is made in section 22 for the sale by adult heirs and guardians of minors of deceased allottees who have received patents.
However, it is unnecessary here to notice other provisions of the sections of the act further than to say that the provisions look to the protection of the Indians, especially the full-bloods, who are less civilized and therefore less able to protect and care for themselves.
Furthermore, if the act extending restrictions against alienation and incumbrance of allotments by full-blood Indians for the period of twenty-five years he held valid, then the validity of the other minor provisions of the act will follow.
The contention of the claimants is that as Congress, by the act of March 3, 1901 (31 Stat. L., 1447), declared Cherokee citizens to be citizens of the United States, they thereby severed the relation of guardian and ward; and having severed that relation, it is not. within the power of Congress to reestablish it; and having by the act of July 1, 1902, acquired-subject to certain restrictions — vested rights in the lands set apart to them, Congress thereby emancipated such allot-tees and their private property from congressional control.
If that contention be true and the claimants and those they represent are sui juris, the invalidity of the acts extend *305 ing restrictions must be conceded, as the general theory of the law is that every citizen of the'United States, not under some disability imposed, by law, is invested with authority to manage and dispose of his own property, to enter into contracts, and to do and perform such acts as pertain to his personal rights, obligations, interests,- and duties.
Another principle of law equally well established is that every one who is competent and sui juris to act for himself may employ another to act for him; and if not competent and sui juris to act for himself, the Government-, through its proper channel, may act for him to the end that he be protected in his rights of person and property.
“ Plenary authority over the tribal relations of the Indians Has been exercised by Congress from' the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the Government.” (Lone Wolf v. Hitchcock, 187 U. S., 553, 565, quoted in the case of Matter of Heff, 197 U. S., 488, 498.)
But the question is too well established to require further comment.
Referring to the acts of Congress continuing the tribal government, and the effect of those acts, the court, in the case of Muskrat et al v. United States (ante, p. 166), said:
“ Section 63 of the act of July 1, 1902, provides that ‘ the tribal government of the Cherokee Nation shall not continue longer than March 4, 1906; ’ but by joint resolution of Congress, March 2, 1906 (34 Stat. L., 822), the tribal existence and present tribal governments of the Cherokee Nation and other civilized tribes in the Indian Territory were ‘ continued in full force and effect for all purposes under existing laws until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members of said tribes, unless hereafter otherwise provided by law.’ And thereafter, by section 28 of the act of April 26, 1906, the tribal existence and present tribal government of said nation ivas, with certain restrictions therein specified, ‘ continued in full force and effect for all purposes authorized by law until otherwise provided by law.’
“ Therefore, in considering the questions involved, we shall assume the validity of those provisions continuing the tribal existence and tribal government of the Cherokee Nation in force and effect until all property of said nation *306 shall have been distributed among the individual members thereof.”
On the authority of those acts the court must assume the continued existence of the tribal government of the Cherokees. Nor will we analyze the acts to ascertain of how much authority the tribal government has been shorn. We are aware of no authority which makes power in the tribe to act essential to constitute tribal relations, though some power may be presumed.
As the United States is the self-constituted guardian of the Indians, with plenary authority over their tribal relation, it is for Congress and Congress alone to determine when that relation shall cease. In other words, when Congress by their legislation have declared that the tribal government of the Cherokees shall “ continue in full force and effect for all purposes authorized by law until otherwise provided by law,” the courts can not enter into the quantum of authority remaining in th.e tribe, and by construction defeat the will and purpose of Congress.
In the case of Matter of Heff, supra (p. 499), the court said:
“ Of late years a new policy has found expression in the legislation of Congress — a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes, free from national guardianship and charged with all the rights and obligations of citizens of the United States. Of the power of the Government to carry out this policy there can be no doubt. It is under no constitutional obligation to perpetually continue the relationship of guardian and ward. It may at any time abandon its guardianship and leave the ward to assume and be subject to all the privileges and burdens of one sui juris. And it is for Congress to determine when and how that relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress. It is true there may be a presumption that no radical departure is intended, and courts may wisely insist that the purpose of Congress be made clear by its legislation, but when that purpose is made clear the question is at an end.”
On the authority of that case the claimants contend that by virtue of the act of March 3, 1901, declaring Cherokee *307 citizens to be citizens of the United States, Congress terminated the relation of guardian and ward, thereby investing them with full power and authority as other citizens of the United States over the control of their property.
In the case of Cherokee Nation v. Hitchcock, supra (at p. 309), being an action to enjoin the Secretary of the Interior, under section 13 of the act of June 28, 1898 (30 Stat. L., 495), from leasing oil lands held for the benefit of said nation, the court said:
“ There is no question involved in this case as to the taking of property; the authority which it proposes to exercise by virtue of the act of 1898 has relation merely to the control and development of tribal property, which still remains subject to the administrative control of the Government, even though the members of the tribe have been invested with the status of citizenship under recent legislation.”
If citizenship may be Conferred upon Indians while in tribal relations without affecting the administrative control of their tribal property, it follows that their communal rights in such property are not thereby removed from the control of Congress.
In the case of National Bank of Commerce v. Anderson (147 Fed. Rep., 87, 90), respecting the sale of allotted lands upon which there was a restriction against alienation for twenty-five years, the court said: “ The granting of citizenship does not affect the character of the title to land allotted to the Indian, nor is the restriction against alienation inconsistent with citizenship;" citing, among others, United States v. Rickert (188 U. S., 432) and United States v. Thurston County (143 Fed. Rep., 287).
The purpose of Congress to retain control of the property and lands of the Cherokee Indians is shown by the enabling act of June 16, 1906 (34 Stat. L., 267), admitting Oklahoma into the Union as a State, section 1 of which provides:
“ That nothing contained in said constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their *308 lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make ' if this act had never been passed.”
Clause 3 of section 3 provides:
“ That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. That land belonging to citizens of the United States residing without the limits of said State shall never be taxed at a higher rate than the land belonging to residents thereof; that no taxes shall be imposed by the State on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use.”
Under that act Oklahoma was admitted into the Union, November 16, 1907.
It has been held that “ the authority of the State can not be so exerted as to impair the power of Congress to regulate commerce with the Indian tribes ” (Dick v. United States, 208 U. S., 340, 353). It has also been held that the United States, in conformity with treaty provisions, may for police purposes retain control over lands in a State the Indian title to which has been extinguished and the lands allotted in severalty, notwithstanding the citizenship of the allottees, and that twenty-five years was not an unreasonable period. (Dick v. United States, supra.)
Though the enabling act was passed June 16, 1906, Oklahoma was not admitted into the Union as a State until after the acts of 1904 and 1906 were in force. Besides, the right of the Government respecting the person and property of the Indians was reserved in the enabling act “ to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this act had-never been passed.” ITence, no question of conflict between national and state authorities is involved.
*309 Does this authority of the United States extend to lands allotted in severalty to Indians declared to be citizens of the United States while tribal relations continue ?
The full-blood Indians to whom allotments have been made are in the main in favor of the restrictions placed upon their lands by the acts in question, and are in favor of the supervision of the Secretary of the Interior over the leasing and sale of their lands, as set forth in Finding XIY. And this, doubtless, for the reason, as set forth in Finding XYI, that prior to the passage of the act of April 26, 1906, many of the full-blood Indians had been induced by designing persons to sell and convey their lands, or contract to sell or to otherwise incumber the same, at grossly inadequate com-jiensation and in violation of the act of July 1,1902.
The same finding also recites that since the passage of the act of April 26, 1906, large numbers of such deeds, mortgages, and contracts to sell and incumber their respective allotments are being filed daily in the office of the recorder of deeds in the counties where such lands are situate, all in violation of said act of 1906. In other words, these were the conditions respecting the lands allotted to the full-blood Indians when the act of 1906 was passed for their protection.
But, independent of the findings, the court will take judicial notice of the Indians as wards of the nation and their consequent dependence upon the Government as their guardian. The native Cherokees were even opposed to the allotment act of 1902, preferring to continue their tribal relations and the communal ownership of the lands. This is shown in the Cherokee Intermarried Whites Case (203 U. S., 76, 93), where the court, after designating said allotment act as an act of Congress and not a treaty, said:
“ It is a singular commentary on the situation that the majority of the native Cherokees voted against its acceptance, which was carried by the vote of the whites.”
The full-bloods or native Cherokees are uneducated and unable to speak the English language, and without the protection of the Government it is manifest that they are liable to lose the lands allotted to them. The restrictions placed upon their lands against alienation, incumbrance, and leasing will be removed when the Government is satisfied that it can *310 withdraw its protection without detriment to the interests of the owners. This is evidenced by the act of May 27, 1908 (35 Stat. L., 312), whereby the acts of 1902 and 1906 have been materially changed and modified, as therein shown.
By section 19 of the act of 1906 the lands upon which the restrictions were imposed are free from taxation so long as held by the original allottees, and this is a benefit and protection and not a detriment to the owner.
As was said by the court in the case of Lone Wolf v. Hitchcock (187 U. S., 553, 567), quoting from the case of United States v. Kagama (118 U. S., 375, 383):
“ The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety or those among whom "they dwell. It must exist in that Government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes.”
So here the exercise of the power of government is necessary to the protection of the less civilized, the weak and the unlettered full-blood Indians, against designing men, as well as for the safety of those with whom they dwell. This does not involve a taking of the property of the full bloods, as the acts in controversy simply subject their allotments to administrative control for their sole benefit until they are sui juris and competent to protect themselves.
It would be strange indeed if the Government in dealing with its wards, desiring to aid them in taking an advance step in civilization by conferring upon them citizenship and the right to hold real estate in severalty, could not invoke its own power while tribal relation exists to protect them in the rights thus conferred. We think the power to do so rests in Congress, notwithstanding the citizenship conferred upon the Indians and the allotment of their lands in severalty.
The acts in question seek the protection of those most in need thereof, and they wisely consent to the administrative shield. If they consent, though by the jurisdictional act some of their number are designated to maintain this action, who will be harmed or what principle of law will be violated *311 in bolding the acts valid while tribal relations are recognized by Congress ?
In respect to the act of March 11, 1904, supra, giving the Secretary of the Interior authority to grant, for a period of twenty years, with' the right of renewal, rights of way for the construction of pipe lines through lands allotted in sev-eralty to individual Indians “ which have not been conveyed to the allottee with full power of .alienation,” we must hold, so far as we are authorized to consider this act, that in view .of the recognized and continued existence of the tribal government the authority therefor, as an administrative act, rests with Congress. ' Whether, if tribal relations should cease, the act would operate to limit the power of the -Secretary within the period of disability imposed by the allotment act of July 1,1902, or whether the authority of the Secretary to grant such rights of way through lands of individual allottees when such allottees shall have acquired full power of alienation, -we deem it unnecessary now to decide. So far as the authority of the Secretary to grant such rights of way through tribal lands, we think there can be no question in view of the authority of Congress to control tribal property.
These acts of 1904 and 1906, and any other acts looking to the protection of the title of these full-blood Indians to the lands allotted to them, are analogous to the protection afforded by the States to the property of infants and others incompetent from any cause to manage their own affairs, though they be citizens of the United States.
It is a just and wise exercise of power, and rises above technicalities. The protection of property against alienation and incumbrance by those incompetent to appreciate the responsibilities of ownership, and, therefore, unable to resist designing men, is essential to the welfare of society, and, therefore, not subversive of the Constitution, but is in furtherance of its purpose to establish justice, insure domestic tranquillity, and to promote the general welfare. Therefore we may concede that if the claimants were separated from their tribe and were sui juris and competent to manage their own affairs the acts extending the restrictions upon the lands of the full-blood Indians might well be held a discrimination among the members of the tribe and an interference with the *312 property rights of citizens of the United States, and, therefore, obnoxious to the Constitution in the sense that the right ■ of alienation, incumbrance, and leasing of their lands was interrupted and delayed; nevertheless, as the restrictions were imposed for their manifest benefit, i. e., that they might have the continued possession, ownership, and consequent enjoyment of their lands until such time as the Government was satisfied they were copipetent to repel designing men and manage their own affairs, we must hold the several acts valid and effective to accomplish the purpose for which they were enacted.
The petition is dismissed.