Ex parte TILDEN.

(District Court, D. Idaho, C. D. September 19, 1914.)

1. INDIANS (§ 38*)—CRIMES—JURISDICTION.

An Indian may not be taken from the jurisdiction of the state courts to answer for an offense not committed on an Indian reservation, unless it appears, as a matter of law, that he is being held for an act done or omitted in pursuance of a law of the United States, as provided by Rev. St. § 753 (Comp. St. 1913, § 1281).

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 22, 64, 66; Dec. Dig. § 38.*]

2. INDIANS (§ 38*)—CRIMES COMMITTED BY INDIAN—TRIAL.

That petitioner for a writ of habeas corpus, held for alleged violation of a state law, was an Indian policeman, and engaged in the discharge of his duties at the time he committed the alleged crime, did not render him immune from prosecution in the state courts.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 22, 64, 66; Dec. Dig. § 38.*]

3. INDIANS (§ 38*)—OFFENSES—TRIAL—"INDIAN COUNTRY"—"INDIAN RESERVATION."

Pen. Code 1910 (Act March 4, 1909, c. 321, 35 Stat. 1151 [Comp. St. 1913, § 10502]) § 328, provides that all Indians committing against the person or property of another Indian or other person certain specified crimes within any state and within any Indian reservation shall be subject to the same laws and be tried in the same courts and in the same manner and be subject to the same penalties as are all other persons committing any of such crimes within the exclusive jurisdiction of the United States. *Held*, that a right of way granted to a railroad company over the Nez

Perce Indian reservation by Act Cong. May 8, 1890, c. 199, 26 Stat. 104, was neither "Indian reservation" or "Indian country," the two words being synonymous; and hence a homicide committed by an Indian policeman on such right of way was not within the exclusive jurisdiction of the federal courts.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 22, 64, 66; Dec. Dig. § 38.*

For other definitions, see Words and Phrases, First and Second Series, Indian Country; Indian Reservation.]

Application for a writ of habeas corpus for Samuel Tilden. Writ denied.

James L. McClear, U. S. Atty., of Cœur d'Alene, Idaho, for applicant.

Miles S. Johnson, Pros. Atty., of Lewiston, Idaho, for respondent.

DIETRICH, District Judge. Samuel Tilden, who is held in custody by Harry Lydon, as sheriff of Nez Perce county, Idaho, applies for a writ of habeas corpus. The matter has been somewhat informally submitted upon the testimony taken upon a charge of murder against the applicant at a preliminary examination before a committing magistrate of Nez Perce county. Upon such hearing the magistrate committed the applicant without bail.

Briefly stated, the facts are that on the 6th day of May, 1914, the applicant, a Nez Perce Indian policeman, with other Indian policemen, went to the railroad station at Joseph, Idaho, under the direction of Theodore Sharp, superintendent of the Nez Perce Indian school, for the purpose of learning whether certain Indians who had been off playing baseball, and who were returning to the "reservation," had with them any intoxicating liquor, and, if so, of preventing them from bringing it on the "reservation." While at the station he got into an altercation with one William Jackson, an Indian, who was a member of the baseball team, and, while the two were struggling together, he inflicted a gunshot wound upon Jackson, from which the latter died on May 8th. The applicant was arrested by state officers, and has been in their custody ever since.

The status of what is referred to as the Nez Perce Indian reservation is pretty fully set forth in the opinion in the case of Dick v. United States, 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 520. Villages and towns inhabited almost exclusively by white people have grown up upon the territory formerly embraced within its limits. Title to much of the land has passed by patent to white people, and in some cases absolute title has passed to Indian allottees, although it is to be inferred that much of the land allotted is still held by the government as trustee for the allottees under what is sometimes referred to as trust patents. At the time of the shooting, Theodore Sharp was superintendent of the Indian school, which is maintained on the reservation, and also seems to have had general charge of the Indians, but it is not clear to just what extent he exercised authority over them or their property. The Indian police force appointed by him with the approval of the Commissioner of Indian Affairs appears to have been main-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tained chiefly for the purpose of preventing the introduction of liquor into the reservation, to which, under a treaty stipulation, as appears in the Dick Case, the general laws of the United States, relating to the introduction of liquor in the Indian country, continue to be applicable, notwithstanding the allottment of a part of the lands and the sale of the other part to white people. The shooting took place upon a railroad right of way granted to the Palouse & Spokane Railway by act of Congress approved May 8, 1890 (26 Stat. 104). The right of way at this point is embraced within the general boundaries of what in the treaty with the Indians of May 1, 1893 (28 Stat. 328, 329), are referred to as the "Langford tracts," the present status of which is not made entirely clear; apparently they are held under a patent from the United States by a town-site company as a town site.

By section 753 of the Revised Statutes of the United States it is provided that:

"The writ of habeas corpus shall in no case extend to a prisoner in jail, unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States; or, being a subject or citizen of a foreign state, and domiciled therein, is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, or order, or sanction of any foreign state, or under color thereof, the validity and effect whereof depend upon the law of nations; or unless it is necessary to bring the prisoner into court to testify."

As a basis for the issuance of the writ, the applicant makes two contentions: First, that he "is in custody for an act done * * * in pursuance of a law of the United States"; and, second, that he is "in custody in violation of * * * a law * * * of the United States."

[1] The first proposition rests upon the assumption that, as an Indian policeman, he was clothed with the authority, when directed by Superintendent Sharp, to search Jackson, and, when the latter offered resistance, to kill him. It is unnecessary to decide with just what authority the applicant was vested or to what extent he had the right of search. If, for the purpose of disposing of this point, we assume that, as is contended on behalf of the respondent, the place where the killing was done was not on an Indian reservation, and was therefore not within the exclusive jurisdiction of this court, the offense with which the applicant stands charged is one within the jurisdiction of the state courts, under whose process he is being held, and we cannot properly take him from their custody unless it appears, as a matter of law, that he is being held "for an act done or omitted in pursuance of a law of the United States." In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55. But, conceding to the applicant all the authority claimed for him as a police officer, the evidence is not of such a conclusive character as to warrant us in saying, as a matter of law, that he was acting within his rights. Where the quality of the applicant's act involves not merely a question of law but an issue of fact as well, the issue of

fact is to be tried by a jury. Assuming that the killing took place off the reservation, then admittedly the federal court has no jurisdiction to try the applicant for murder; and if, while acting as Indian policeman, for the ostensible purpose of arresting or searching Jackson, the applicant wantonly killed him, or killed him under circumstances which were not justifiable, the only tribunal in which he can be tried and by which he can be punished is the state court; and, if we were to grant the writ, he would escape prosecution entirely. If, upon the trial in the state court, the applicant should be denied any right under, or any protection afforded by, the Constitution or laws of the United States, he will not be without remedy.

[2] But clearly he is not exempt from trial in the state court merely because he is an Indian policeman and, generally speaking, was engaged in the discharge of his duties. The question still remains whether the circumstances were such as to justify the homicide. He may set up his official character and authority as a defense, and, under proper instructions from the trial court as to the extent of such authority, it will be for the jury to determine whether his defense is well founded.

[3] The other proposition rests upon the assumption that the point where the killing took place is an "Indian reservation," and is based upon section 328 of the Federal Penal Code of 1910, which provides that:

"All Indians committing against the person or property of another Indian or other person any of the following crimes, namely, murder, * * * within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

It is not thought necessary to discuss in detail the status of the applicant. For the purposes of the decision, it is assumed that he is an Indian, within the meaning of this section. If, therefore, the right of way at the point in question is within an Indian reservation, the crime, if any was committed, falls within the exclusive jurisdiction of the federal courts. It will also be assumed, but it is not decided, that, if such be the fact, the defendant is "in custody in violation of * * * a law * * * of the United States," and that therefore a proceeding in habeas corpus is a proper remedy.

The contention that the railroad right of way and the "Langford tracts" still constitute a part of the reservation is thought to be ruled adversely to the applicant by Clairmont v. United States, 225 U. S. 551, 32 Sup. Ct. 787, 56 L. Ed. 1201. In that case it was expressly held that the taking of intoxicating liquor upon the right of way of the Northern Pacific Railroad Company, where the same ran through the Flathead Indian reservation, did not constitute an introduction into the Indian country. The status of the right of way there considered is not substantially different from that of the right of way here involved. On behalf of the applicant a distinction is sought to be made between the meaning of the phrase "Indian country," as used in the statute prohibiting the introduction of intoxicating liquor, and the phrase "Indian

reservation," as used in section 328 above referred to, and certain expressions of Mr. Justice Brewer in United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195, are relied upon. But the language there used must be understood in the light of the facts under consideration. It is not thought that such distinction is applicable here. The phrases are used interchangeably in the Clairmont Case, the facts of which are more like those here involved. The last paragraph of the opinion in that case is as follows:

"Our conclusion must be that the right of way had been completely withdrawn from the *reservation* by the surrender of the Indian title, and that, in accordance with the repeated rulings of this court, it was not *Indian country*. [Italics ours]. The District Court, therefore, had no jurisdiction of the offense charged, and the judgment must be reversed."

So, in the more recent case of Donnelly v. United States, 228 U. S. 243, 33 Sup. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710, in speaking of the meaning of the phrase "Indian country," the court said:

"With reference to country that was formerly subject to the Indian occupancy, the cases cited furnish a criterion for determining what is 'Indian country,' but 'the changes which have taken place in their situation' are so numerous and so material that the term cannot now be confined to land formerly held by the Indians, and to which their title remains unextinguished. And, in our judgment, nothing can more appropriately be deemed 'Indian country,' within the meaning of those provisions of the Revised Statutes that relate to the regulation of the Indians and the government of the Indian country, than a tract of land that, being a part of the public domain, is lawfully set apart as an Indian reservation."

If, as contended by the petitioner, he cannot be tried in the state court for an offense committed upon this right of way, it is apparent that if he or any other Indian should commit any one of the offenses named in section 328, anywhere within the boundaries of what was formerly the Nez Perce Indian reservation, against either an Indian or a white man, jurisdiction of such offense would be exclusively in this court. So that if an Indian should go upon patented farm land or into one of the towns or villages and commit murder, manslaughter, rape, assault, arson, burglary, or larceny against the person or property of either an Indian or a white person, the local state courts would be without jurisdiction, for no distinction can be drawn between the status of this right of way and that of the lands upon which these towns and villages are situated and of the numerous farms owned by white people within the boundaries of the reservation. I cannot assent to a view having such extraordinary implications. The treaty stipulation, considered in the Dick Case, supra, operates to retain jurisdiction for the enforcement only of the anti-liquor statutes, not of those relating to other crimes.

An order will be entered denying the writ.