STATE, Plaintiff, vs. JOHNSON, Defendant.

*June 6—June 29, 1933.*

302

The cause was submitted for the plaintiff on the briefs of the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *G. Arthur Johnson,* district attorney of Ashland county, and for the defendant on that of *C. A. Lamoreux,* attorney, and *Lamoreux & Cate* of counsel, all of Ashland.

A brief was also filed by *Thomas L. St. Germaine* of Lac du Flambeau as *amicus curiæ.*

NELSON, J. From the facts reported it appears that the defendant is an incompetent Indian,—that is to say, one to whom the United States has allotted lands which are still held in trust for him by the government of the United States; that he is a member of the Bad River Band of Chippewa Indians and resides within the boundaries of the Bad River Indian Reservation; that, while hunting for deer on certain lands which had been fully patented and during the closed season for deer, he mistook Frank Gervais for a deer and shot and killed him.

Question 1 requires us to decide whether the circuit court for Ashland county has jurisdiction to try the defendant for manslaughter committed by him on fully patented lands located within the exterior boundaries of the Bad River Indian Reservation. In *State v. Rufus,* 205 Wis. 317, 237 N. W. 67, this court recently held that the courts of this state are without jurisdiction to entertain a criminal prosecution of an Indian having tribal relations and residing on a reservation, for the crime of statutory rape committed within the limits of a reservation, upon an Indian woman having tribal relations and also residing on the reservation. That case required, as does this, a construction of sec. 328 of the federal Criminal Code (18 USCA, § 548), which is as follows:

"All Indians committing against the person or property of another Indian or other person any of the following crimes, namely—murder, manslaughter, rape, assault with intent to kill, assault with a dangerous weapon, arson, bur-

glary, and larceny, within any Territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such Territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases. And all such Indians committing any of the above named crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States. Any Indian who shall commit the offense of rape upon any female Indian within the limits of any Indian reservation shall be imprisoned at the discretion of the court."

The *Rufus Case* involved a crime committed by a tribal Indian against the person of another tribal Indian, both of whom resided upon an Indian reservation. The present case involves a crime committed by a tribal Indian against a white man upon fully patented lands located within the exterior boundaries of an Indian reservation. We are therefore required to deal with a situation which is quite different from the situation in the *Rufus Case*. Sec. 328 of the federal Criminal Code (*supra*) provides that all Indians committing any of the crimes named therein "against the person or property of another Indian *or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation,* shall be subject to the same laws, tried in the same courts and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

If the place of the crime was "within the limits of an Indian reservation," then obviously the federal courts have

exclusive jurisdiction to try the defendant. The controlling question, therefore, is whether fully patented lands located within the exterior limits of an Indian reservation may properly be held to be "within the limits of an Indian reservation." We do not think that lands, the title to which has been fully relinquished by the United States and to which the jurisdiction of the state, for taxation and other governmental purposes, has attached, are "within the limits of an Indian reservation" as that language should be construed.

This precise question seems not to have been considered by the supreme court of the United States. At least no case has been found in which the language, "within the limits of an Indian reservation," has been construed. However, in *Clairmont v. United States,* 225 U. S. 551, 32 Sup. Ct. 787, it was held that the federal district court of Montana had no jurisdiction to try the defendant therein for the offense charged. The conviction in that case was obtained under the act of January 30, 1897 (ch. 109, 29 U. S. Stats. at L. 506), which, among other things, prohibited any person from introducing any intoxicating liquors "into the Indian country." The indictment charged in substance that the defendant unlawfully introduced a quantity of intoxicating liquor into the Flathead Indian Reservation, the said reservation being Indian country. The defendant was an Indian who, at the time of his arrest and the finding of liquor on his person, was on a train of the Northern Pacific Railway Company. He had boarded the train at Arlee and was intending to leave it at Ravalli, both of which points were within the exterior limits of the reservation. It appeared that the railroad company had theretofore obtained from the United States and from the confederated tribes interested, full, complete, and unrestricted title to a right of way through the reservation. The question considered in that case was whether the defendant, who had intoxicating liquor in his possession on a railroad train which was being operated on the strip of land constituting the railroad right of way and within the ex-

terior boundaries of the reservation, could be deemed to have introduced liquor "into the Indian country." It was held, citing *Bates v. Clark*, 95 U. S. 204, 24 Lawy. Ed. 471, and *Dick v. United States*, 208 U. S. 340, 28 Sup. Ct. 399, that the Indian title or right of occupation having been extinguished without reservation, the relinquished strip came under the jurisdiction of the then territory and later of the state of Montana. The court concluded that the right of way had been completely withdrawn from the reservation by the surrender of the Indian title and that in accordance with the repeated rulings of that court it was not Indian country.

While the *Clairmont Case* involved the construction of the words "Indian country," we think the decision in that case rules this. We perceive no distinction between the phrase "into the Indian country" and the phrase "within the limits of an Indian reservation," nor between lands conveyed without restriction to a railroad and lands conveyed without restriction to an individual.

In *State v. Tilden*, 27 Idaho, 262, 147 Pac. 1056, it was held that title to land embraced within the right of way of a railroad was not Indian country, relying on *Clairmont v. United States, supra*.

In *Ex parte Tilden*, 218 Fed. 920, a *habeas corpus* proceeding in which the release of Tilden was sought, the district court of Idaho held that the words "Indian reservation" and "Indian country" were synonymous, and that a homicide committed by an Indian policeman, on a railroad right of way granted by act of Congress and at a point embraced within the exterior boundaries of an Indian reservation, was not within the exclusive jurisdiction of the federal courts, citing *Clairmont v. United States, supra*. The court said (p. 924) :

"If, as contended by the petitioner, he cannot be tried in the state court for an offense committed upon this right of

way, it is apparent that if he or any other Indian should commit any one of the offenses named in sec. 328, anywhere within the boundaries of what was formerly the Nez Perce Indian reservation, against either an Indian or a white man, jurisdiction of such offenses would be exclusively in this court. So that if an Indian should go upon patented farm land or into one of the towns or villages and commit murder, manslaughter, rape, assault, arson, burglary, or larceny against the person or property of either an Indian or a white person, the local state courts would be without jurisdiction, for no distinction can be drawn between the status of this right of way and that of the lands upon which these towns and villages are situated and of the numerous farms owned by white people within the boundaries of the reservation. I cannot assent to a view having such extraordinary implications."

In *State v. Big Sheep*, 75 Mont. 219, 243 Pac. 1067, 1071, it was held, in a very exhaustive and well reasoned opinion, that if an Indian, who is still a ward of the government, commits a crime upon land to which the United States had relinquished title, the state has jurisdiction, saying:

"Lands to which the United States has parted with title and over which it no longer exercises control, even if within the exterior boundaries of the reservation, are not deemed a part of the reservation."

In *State ex rel. Best v. Superior Court*, 107 Wash. 238, 181 Pac. 688, a writ prohibiting the court from trying an incompetent Indian for the crime of grand larceny committed within the limits of the south half of the diminished Colville Indian reservation, not upon allotted lands, was denied. It was there said (p. 240):

"By the enabling act, Washington was authorized to adopt a constitution, establish a state government, and was admitted into the Union upon equal footing with the original states, which carried with it the full power of enacting laws against crimes and punishing all those within her borders who might transgress such laws, be they citizens or not.

This must be so, since the state became sovereign, with full power, except only those powers which had been delegated to the national government. And relator has not contended, and cannot contend, that any power was ever delegated to the national government to enact or enforce criminal laws applicable within the territorial limits of any state, except only those portions thereof which were exclusively within the jurisdiction of the federal government, such as Indian reservations and the like. What is still known as the south half of the diminished Colville Indian reservation is no longer an Indian reservation. By virtue of the act of Congress of March 22, 1906 (34 U. S. Stats. at L. 80, ch. 1126), the President of the United States, by his proclamation of May 3, 1916 (39 U. S. Stats. at L. 1778), restored all of the south half of the diminished Colville Indian reservation to the public domain, subject only to the reservations and allotments of land in severalty to the individual Indians. Moreover, Congress has never attempted to enact any criminal statute dealing with any act committed by an Indian outside of the territorial jurisdiction of the United States." See, also, *Eugene Sol Louie v. United States,* 274 Fed. 47.

In *United States v. Frank Black Spotted Horse,* 282 Fed. 349, the district court of South Dakota reached a conclusion contrary to the weight of authority and held that an Indian who had committed murder within the limits of the Rosebud Indian reservation on lands which had been fully patented could not be tried in the state court. The court seems to have been largely influenced in reaching its conclusion by the difficulties which it thought would result from holding that small isolated tracts owned by patent-in-fee Indians, scattered throughout a very extensive reservation, were under the jurisdiction of the state, and also by the probable intention of the legislature revealed in the act by which the state ceded the lands to the government of the United States, and in which the Congress assumed jurisdiction of the lands as they existed within the boundaries of the reservation at the time of the cession.

The jurisdiction of a state to try in its courts an Indian charged with an offense committed outside of territory of the United States, even though the offender be a ward of the federal government, has never been seriously questioned. Such jurisdiction apparently has never been denied by any statute of the United States or by the federal courts. If such jurisdiction were denied by a federal statute, such statute would probably have to be held unconstitutional as an infringement upon the sovereignty of the states. *State v. Superior Court,* 107 Wash. 238, 181 Pac. 688; *Pablo v. People,* 23 Colo. 134, 46 Pac. 636; *State v. Buckaroo Jack,* 30 Nev. 325, 96 Pac. 497; *State v. Spotted Hawk,* 22 Mont. 33, 55 Pac. 1026.

We think the correct rule, supported by sound reason and the weight of authority, is that the state courts have jurisdiction to try Indians for offenses committed upon fully patented lands even though such lands are located within the exterior boundaries of an Indian reservation; that when the lands are fully patented by the United States they cease to be territory of the United States and become subject to the jurisdiction of the state and its laws. It therefore follows that the first question must be answered "Yes."

Question 2 inquires as to whether the circuit court for Ashland county has jurisdiction to try an Indian for the offense of hunting deer out of season, on lands located within the exterior boundaries of an Indian reservation but which have been fully patented by the United States. In view of the answer to question 1, question 2 would necessarily have to be answered in the affirmative if an offense not involving hunting (or fishing) were charged. In the briefs submitted by the attorney general, the district attorney of Ashland county, and the attorney for the defendant, it seems to be assumed that the answer to question 1 necessarily rules the answer to question 2. It is, however, ear-

nestly contended in a brief submitted by Thomas L. St. Germaine, as *amicus curiæ,* that a Chippewa Indian who resides on the Bad River Indian Reservation cannot be prosecuted for a violation of the fish and game laws of this state because of the provisions of certain treaties entered into between the Chippewa Indians and the United States whereby the said Indians ceded to the United States vast areas of land but in which they reserved hunting and fishing rights. The first treaty mentioned was made and concluded at St. Peters in 1837 between the United States and the Chippewa Nation of Indians (7 U. S. Stats. at L. 536, 537). Art. 5 of that treaty is as follows:

"The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guaranteed to the Indians, during the pleasure of the President of the United States." Indian Affairs, Laws and Treaties, vol. 2, compiled by Charles J. Kappler, Senate document No. 452, 1st Session 57th Congress, p. 365.

The next treaty mentioned was made and concluded at La Pointe in 1842 between the United States and the Chippewa Indians of the Mississippi and Lake Superior (7 U. S. Stats. at L. 591–593). Art. II of that treaty is as follows:

"The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress." Senate document No. 452 (*supra*), p. 402.

The third treaty mentioned was made and concluded at La Pointe in 1854 between the United States and the Chippewa Indians of Lake Superior and the Mississippi (10 U. S. Stats. at L. 1109). By this treaty the United States agreed, among other things, to set apart and withhold from sale, for the La Pointe Band, certain lands bordering on Lake Su-

perior, and also 200 acres on the northern extremity of Madeline Island for a fishing ground. These lands constitute the Bad River Reservation.

Art. 11 of that treaty provides as follows:

"All annuity payments to the Chippewas of Lake Superior, shall hereafter be made at L'Anse, La Pointe, Grand Portage, and on the St. Louis river; and the Indians shall not be required to remove from the homes hereby set apart for them. And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President." Senate document No. 452, pp. 484–487.

All of the treaty provisions which reserve hunting and fishing rights to the Chippewa Indians obviously relate to the lands ceded rather than to the lands reserved and retained. The lands upon which the defendant hunted deer during the closed season therefor were not within any area ceded by the treaties mentioned, but were lands within the boundaries of the Bad River (La Pointe) Reservation retained by them in the treaty of 1854 to which they retired as their permanent abode. While the treaty entered into did not specifically reserve to the Indians such hunting and fishing rights as they had theretofore enjoyed, we think it reasonably appears that there was no necessity for specifically mentioning such hunting and fishing rights with respect to lands reserved by them. At the time the treaty of 1854 was entered into there was not a "shadow of impediment upon the hunting rights of the Indians" on the lands retained by them. "The treaty was not a grant of rights to the Indians but a grant of rights from them—a reservation of those not granted." *United States v. Winans,* 198 U. S. 371, 25 Sup. Ct. 662, 664. We entertain no doubt that the rights of the Indians to hunt and fish upon their own lands continued. If the lands here involved were not fully patented we should have no difficulty in concluding that as to such lands the fish and game laws of this state are without force and effect.

But the present action involves lands fully patented to an Indian and thereafter sold and conveyed without reservation or restriction to a citizen of this state. As to such lands, may it be said that they were sold subject to an implied covenant or condition that members of the Chippewa tribe might perpetually hunt thereon without restriction. We think it would be unreasonable so to hold.

In *United States v. Winans, supra,* it was held that certain fishing rights reserved to the Yakima Indians by a treaty imposed a servitude on the lands relinquished, as against the United States, the state, and their grantees. The present action, however, involves no treaty reservation which imposes upon fully patented lands the Indians' right to hunt thereon without restriction. In *People ex rel. Kennedy v. Becker,* 241 U. S. 556, 36 Sup. Ct. 705, 707, a treaty concluded between the Seneca tribe and Robert Morris was considered. By that treaty certain lands were granted to Robert Morris, subject to the following reservation:

"Also, excepting and reserving to them, the said parties of the first part and their heirs, the privilege of fishing and hunting on the said tract of land hereby intended to be conveyed."

It was held that that reservation gave to the tribe, to the grantees of the lands, and to others to whom such privilege might be extended, hunting and fishing privileges, in common, but subject to the necessary power of proper regulation by the state having inherent sovereignty over the land.

We have entered into this brief discussion of the treaties called to our attention by *amicus curiæ* for the purpose of showing that any reservation contained in said treaties can have nothing to do with this controversy since such reservation related to the lands ceded rather than to the lands retained.

We conclude that it would be unreasonable to hold, in the absence of a treaty or express reservation so providing, that

the defendant had unrestricted rights to hunt on lands fully patented to an Indian, and thereafter sold by him to one who is a citizen of this state and which were, at the time of the commission of the offense, under the jurisdiction of the state of Wisconsin for all governmental purposes. It is our conclusion that the second question should be answered "Yes."

It is intimated in a letter addressed to the court by *amicus curiæ,* that in August, 1932, while he was acting as attorney for the defendant, he wrote the district attorney of Ashland county requesting information as to the date of the defendant's trial; that the district attorney wrote him that the case would be called for trial on September 7th or 8th, 1932; that he appeared at Ashland for trial on September 7th and learned that the case had been called for trial on September 3d, at which time the defendant had plead guilty to both counts of the information without having the benefit of advice of counsel. We think the matter complained of should be investigated by the trial court to the end that if it shall appear that defendant's pleas were either not voluntarily entered, or were entered without any understanding as to the nature of the charges made against him, he should be permitted to change his pleas of guilty and be given the benefit of a trial. Nothing herein said is intended to reflect in the slightest way upon the fairness of either the court or the district attorney. However, since this information has come to us, we pass it on to the trial court so that it may make such investigation and take such action as it deems proper before imposing sentence.

*By the Court.*—The questions reported to this court are both answered "Yes."