STATE, Plaintiff in error, v. SANAPAW and another, Defendants in error.*

SAME, Plaintiff in error, v. BASINA, Defendant in error.*

*October 4—November 1, 1963.*

*Motion for rehearing denied, without costs, on December 20, 1963.

For the plaintiff in error the cause was argued by *John H. Bowers,* assistant attorney general, with whom on the briefs were *George Thompson,* attorney general, and *Lyle E. Strahan,* deputy attorney general.

For the defendants in error there was a brief and oral argument by *Ken Traeger* of Gresham.

CURRIE, J.   The question presented by the writs of error is:

Upon termination of federal supervision and control over the Menominee Indian Tribe and the Menominee Indian Reservation, did the enrolled members of the tribe and their lands become subject to the same Wisconsin game laws as other persons and lands within the state?

In order to resolve this question it is necessary to review the pertinent historical facts.   These commence with the treaty of October 18, 1848, between the United States and the Menominee Tribe (9 U. S. Stat. at L., p. 952).   By this treaty the Menominees ceded, sold, and relinquished to the United States "all their lands in the State of Wisconsin wherever situated." [1]   The treaty further provided that, in

---

[1] The boundaries of the area ceded to the United States under this treaty, which form a wedge-shaped tract located in east central Wisconsin, are shown on map "Wisconsin 1," Royce, Indian Land Cessions, Part 2, House Documents, Vol. 118, H. R. Doc. No. 736, 56th Congress, 1st session, Eighteenth Annual Report of the Bureau of American Ethnology to the Secretary of the Smithsonian Institution (1896–1897).   The figure 271, which is superimposed upon

consideration for this cession, the United States give the Indians "for a home, to be held as Indians' lands are held" a large tract of land west of the Mississippi river, and that the Menominees "shall be permitted, if they desire to do so, to remain on the lands hereby ceded for and during the period of two years from the date hereof, and until the President shall notify them that the same are wanted." In 1850 an exploring party found that the lands west of the Mississippi were unsuited to the Menominees' circumstances. As a result they then petitioned the President for permission to stay longer on the ceded lands. Thereafter, Elias Murray, superintendent of Indian affairs, accompanied by three of the Menominee chiefs, explored lands on the Wolf and Oconto rivers in Wisconsin, and Murray recommended as a home for the Menominees a tract 30 by 18 miles, comprising 15 townships.[2]

By further treaty made on May 12, 1854 (10 U. S. Stat. at L., p. 1064), the United States ceded to the Menominees a tract 24 by 18 miles on the Wolf river, consisting of 12 townships, "to be held as Indian lands are held." [3] This 1854 treaty stated that its articles were "supplementary and amendatory" to the 1848 treaty. By the 1854 treaty the Menominees ceded back to the United States all lands west of the Mississippi. In 1856 the Menominees sold to the Stockbridge Indians two of their 12 townships. The remaining 10 townships thus constituted the Menominee Indian Reservation. This reservation continued in existence

this area of the map, is explained at pages 780, 781. The approximate boundaries of this area are also shown on a smaller map appearing in Raney, Wisconsin—A Story of Progress, at page 78.

[2] These facts are set forth in Menominee Tribe of Indians (1942), 95 Court of Claims, p. 232.

[3] This tract, less the two townships later sold to the Stockbridge Tribe, is shown on the map designated as "Wisconsin 2" of Royce, Indian Land Cessions, referred to in footnote 1, and is designated on the map by the numeral 322.

until the "Termination Act" (68 U. S. Stat. at L., p. 250, as amended, 70 U. S. Stat. at L., p. 549, 72 U. S. Stat. at L., p. 290, 74 U. S. Stat. at L., p. 867; 25 U. S. C. secs. 891–902, passed originally by the Congress in 1954, became effective by the Secretary of Interior's proclamation of April 29, 1961, 26 Fed. Reg., No. 82, April 29, 1961, at page 3726). This proclamation proclaimed the transfer (pursuant to sec. 899 of the Termination Act) of all tribal property held in trust by the United States government, and the termination of all federal supervision and control over the Menominee Indians and the Menominee Indian Reservation effective midnight April 30, 1961. Title to the lands comprising the former Menominee Indian Reservation is now held by Menominee Enterprise, Inc., a Wisconsin corporation incorporated on January 23, 1961. The capital stock of this corporation is held in a voting trust for the benefit of the members of the Menominee Indian Tribe. The acts committed by defendants which led to the instant criminal prosecutions occurred on these lands.

In view of the foregoing history we are faced with the preliminary question of whether, at the time the Termination Act became effective, the Menominees had exclusive hunting rights free from the state's game laws which arose either by reservation under the 1848 treaty (as modified by the 1854 treaty), or by cession under the 1854 treaty.

This court in *State v. Johnson* (1933), 212 Wis. 301, 249 N. W. 284, citing *United States v. Winans* (1905), 198 U. S. 371, 25 Sup. Ct. 662, 49 L. Ed. 1089, held that where Indians cede part of their lands by treaty and retain other lands, for their own use, as to which no government patents have ever been issued, their rights to fish and hunt on their retained lands, without being subject to the state's fish and game laws, continue even though the treaty contains no express reservation to that effect. We do not consider, how-

ever, that this principle has any application to the instant cases for two reasons. First, on the record before us, we cannot determine whether the lands where the alleged offenses were committed were part of the lands then owned by the Menominees at the time of the 1848 treaty. Only part of the former Menominee Indian Reservation was included in the tract ceded to the United States by that treaty. The other part of the reservation consisted of lands which the Chippewa Indians had ceded to the United States by treaty made October 4, 1842.[4] Secondly, the 1848 treaty ceded all Menominee lands in Wisconsin to the United States, and the 1854 treaty did not abrogate this cession, but made an entirely new cession of the 12 townships to the Menominees. This is so even though the 1854 treaty stated that it was "supplementary and amendatory" to the 1848 treaty.

Therefore, if the Menominees, prior to the effective date of the Termination Act, had exclusive hunting rights over the lands embraced in their reservation free from the state's game laws, such rights must be grounded on the 1854 treaty provision whereby such lands were ceded to them *"to be held as Indian lands are held."* On the face of it this is an ambiguous provision. One permissible interpretation would be that the Menominees would enjoy the same rights with respect to the ceded lands as Indians are entitled to with respect to lands owned and occupied by them which have never been ceded by treaty. Among such rights would be that of hunting free from the restrictions of any state game laws. The rule of construction to be followed in interpreting Indian treaties is that in case of ambiguity they are to be interpreted in favor of the Indians. This was the holding in *Winters v. United States* (1908), 207 U. S. 564, 576, 28 Sup. Ct. 207, 52 L. Ed. 340, wherein the court declared:

[4] This is apparent by comparing maps "Wisconsin 1" and "Wisconsin 2" of Royce referred to in footnotes 1 and 3, and by referring to pages 776, 777 of the text. The lands ceded by the Chippewas in 1842 is represented on map "Wisconsin 1" by the tract bearing the numeral 261.

"By a rule of interpretation of agreements and treaties with the Indians, ambiguities occurring will be resolved from the standpoint of the Indians. And the rule should certainly be applied to determine between two inferences, one of which would support the purpose of the agreement and the other impair or defeat it."

It would seem unlikely that the Menominees would have knowingly relinquished, their special fishing and hunting rights which they enjoyed on their own lands, and have accepted in exchange other lands with respect to which such rights did not extend. They undoubtedly believed that these rights were guaranteed to them when these other lands were ceded to them "to be held as Indian lands are held." Construing this ambiguous provision of the 1854 treaty favorably to the Menominees, we determine that they enjoyed the same exclusive hunting rights free from the restrictions of the state's game laws over the ceded lands, which comprised the Menominee Indian Reservation, as they had enjoyed over the lands ceded to the United States by the 1848 treaty.

This brings us to the crucial question of whether these exclusive rights to hunt free of the state's game laws were ended by the taking effect of the Termination Act. The Congress has plenary power to deal with the Indians and may abrogate by statute Indian privileges and rights, including treaty rights. This principle was clearly enunciated in *Lone Wolf v. Hitchcock* (1903), 187 U. S. 553, 565, 23 Sup. Ct. 216, 47 L. Ed. 299, wherein the court stated:

"Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government. Until the year 1871 the policy was pursued of dealing with the Indian tribes by means of treaties, and, of course, a moral obligation rested upon Congress to act in good faith in performing the stipulations entered into on its behalf. But, as with treaties made with foreign nations, *Chinese*

*Exclusion Case,* 130 U. S. 581, 600, the legislative power might pass laws in conflict with treaties made with the Indians. *Thomas v. Gay,* 169 U. S. 264, 270; *Ward v. Race Horse,* 163 U. S. 504, 511; *Spalding v. Chandler,* 160 U. S. 394, 405; *Missouri, Kansas & Texas Ry. Co. v. Roberts,* 152 U. S. 114, 117; *The Cherokee Tobacco,* 11 Wall. 616."

For a recent federal case which acknowledges the existence of this plenary power of the Congress over Indian tribes which cannot be limited by treaties, see *Anderson v. Gladden* (9th Cir. 1961), 293 Fed. (2d) 463, affirmed by memorandum decision (1961), 368 U. S. 949, 82 Sup. Ct. 390, 7 L. Ed. (2d) 344.

Sec. 891 of the Termination Act provides that the purpose "is to provide for orderly termination of Federal supervision over the property and members of the Menominee Indian Tribe of Wisconsin." Sec. 899 of the act provides that upon the Secretary of the Interior's publishing a proclamation in the Federal Register that all tribal property has been transferred in accordance with the act, "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and *the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction."* (Italics supplied.)

The italicized statutory language, given its plain and ordinary meaning, would subject the Menominees' pre-existing exclusive hunting rights to the state's game laws. However, defendants' counsel contends that the legislative history surrounding the enactment of the Termination Act precludes such an interpretation because it shows that this was not the intent of the Congress.

The original bill, which was finally enacted by the 83d Congress in 1954 as the Termination Act, originated in the House of Representatives as H. R. 2828. Two other com-

panion bills to provide for the withdrawal of the Menominee Tribe from federal jurisdiction were also introduced, the one in the Senate being S. 2813, and the one in the House of Representatives being H. R. 7135. Joint hearings on all three bills were held before subcommittee of the Committee on Interior and Insular Affairs of the Senate and the subcommittee of the Committee on Interior and Insular Affairs of the House of Representatives on March 10, 11, and 12, 1954. Both S. 2813 and H. R. 7135 contained express provisions which preserved any special hunting and fishing rights the Menominees might have by treaty, statute, custom, or judicial decision. H. R. 2828 contained no such corresponding provision. At pages 587, 589, the printed report of the proceedings of this joint hearing [5] contains a letter dated March 5, 1954, addressed to the chairman of the House Committee on Interior and Insular Affairs by Orme Lewis, Assistant Secretary of the Interior, which explains the differences between the three bills, and mentions the difference in the treatment of hunting and fishing rights noted above. With respect to H. R. 2828 the letter states (p. 588) :

"H. R. 2828 contains no provision on this subject. It does not purport to affect any treaty rights the Indians may have. If any special hunting and fishing rights have been granted by statute, however, they will be repealed by the provision of the bill making inapplicable all statutes that apply to Indians merely because of their status as Indians."

H. Rex Sigler of the Solicitor's Office, Department of Interior, gave this testimony at the joint hearing (p. 629) :

"The next difference relates to hunting and fishing rights. The earlier bill [H. R. 2828] does not say anything at all

---

[5] "Joint hearings Before the Subcommittee of the Committees on Interior and Insular Affairs, Congress of the United States, Eighty-Third Congress, Second Session on S. 2813, H. R. 2828 and H. R. 7135."

about the subject. It is silent. And by its silence it, in my judgment, makes no change in any treaty rights that may exist. However, the earlier bill will repeal any hunting and fishing rights that may have been granted by statute. I do not know of any such rights, but there is the general provision in the bill making inapplicable to these Indians Federal legislation that applies to Indians as such, which would affect any special statute that may be on the books. Again, I do not know of any such statute. It would not, however, in my judgment, affect the treaty rights, which are not specifically mentioned but are not in conflict with this particular bill.

"The later bill, however, would specifically preserve all hunting and fishing rights granted not only by treaty but also by statute or custom or judicial decision. And to that extent, the bill would qualify the authority of the State to apply its conservation laws. So the issue, as I see it, is whether the Federal Government should specifically provide that hunting and fishing rights beyond treaty rights should be immune from State regulation."

Both the Lewis letter and the Sigler statement are favorable to the defendants' position. This is because both take the position that H. R. 2828 would not affect fishing and hunting rights conferred by treaty while it would affect those conferred by statute. Neither, however, specifically mentions the provision of the bill now found in sec. 899 of the Termination Act that *"the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction."* (Italics supplied.)

At the joint hearing Glen A. Wilkinson, attorney for the Menominee Tribe, submitted a written statement which is printed in full in the report of this hearing. In this written statement Wilkinson commented on that part of the Lewis letter, or report, of March 5, 1954, quoted above (p. 697):

"... the statement is made that 'H. R. 2828 contains no provision on this subject. It does not purport to affect any treaty rights the Indians may have.' Whether it 'purports' to affect such treaty rights seems immaterial; the fact is that it does, at least by implication abolish the tribal rights to exclusive hunting and fishing privileges within the reservation—rights which were solemnly assured to the tribe in perpetuity."

Thus two conflicting interpretations of the effect of H. R. 2828 on the Menominees' fishing and hunting rights were presented at the joint hearing. Counsel for the defendants contends that the tribal representatives agreed to the interpretation of Lewis and Sigler. Wilkinson's statement seems to refute this. We are unable to find any proof that the Congress in enacting H. R. 2828, without any express reference to hunting and fishing rights, intended to agree with the interpretation of Lewis and Sigler. An equally tenable inference is that the Congress, in enacting the Termination Act which ended the status of the Menominees as wards of the United States, intended that whatever exclusive hunting and fishing rights the Indians possessed on their tribal lands should be subject to the same state conservation laws as are the hunting and fishing rights of any other landowners.

In considering the instant problem of interpretation we consider pertinent the preamble of House Concurrent Resolution 108, 83d Congress, 1st Session, pursuant to which resolution H. R. 2828 was drafted and introduced:

"Whereas it is the policy of Congress, as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship; and

"Whereas the Indians within the territorial limits of the United States should assume their full responsibilities as American citizens :" [6]

It is our conclusion that the express provision of sec. 899 of the Termination Act that "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction," includes the state conservation laws applicable to hunting. To this extent the Termination Act abrogates any right to be free of the state's game laws in exercising hunting rights over the former tribal lands of the reservation. Whether the Menominees by reason of treaty still enjoy any special hunting rights over their former reservation lands, other than that of being free of such game laws, which were not abrogated by the Termination Act, we do not here decide.

*By the Court.*—Judgments reversed, and causes remanded for further proceedings not inconsistent with this opinion.

DIETERICH, J. (*dissenting*). I cannot agree with the majority decision that the Termination Act abrogates the rights of the Menominee Indians to exercise their hunting and fishing rights free from the state's game laws. The majority concedes that under the 1848 and 1854 treaties the hunting and fishing rights of the Menominee Indians were held free from state game law restrictions. The Termination Act of 1961, contains no reference to the subject, and does not purport to affect any treaty rights the Indians may have. The Termination Act is based on the assumption that during the years of government supervision of Indian affairs, the government has so advanced and prepared the Indians for modern living, that they have become self-sufficient. The

---

[6] This resolution is set forth in full at page III of the report of the joint hearing referred to in footnote 5.

amount of fiscal aid provided the Menominees in the short period since the enactment of the Termination Act is by itself sufficient to show the unsoundness of this assertion. While hunting and fishing is not in itself a sufficient supplement to the modern way of life, it does help. The rights of the Menominee Indian to hunt and fish on tribal lands far outweigh any need of the state of Wisconsin or any of its agencies to invade these rights. This is especially so in that these rights were reserved to the Menominees under the treaties of 1848 and 1854.

An examination of the record discloses that the deed of forest lands from the United States to Menominee Enterprises, Inc., dated April 26, 1961, contains a provision prohibiting transfer of ownership of the lands for a period of thirty years without prior consent of the state conservation commission and approval of the Governor. The conveyances from Menominee Enterprises to the individual Menominee Indian landholders give Menominee Enterprises an option to repurchase the lands in the event that the grantees decide to sell. In other words, Menominee Enterprises exercises complete control over the lands. It should also be noted that the Termination Act provides a way of life for the Indians by a provision that the timberland be operated on a sustained-yield basis. Their other way of life, namely by hunting and fishing, is not referred to at all. The conveyances give Menominee Enterprises complete control over transfer of the lands, and the sustained-yield provisions of the Termination Act control the use of the lands. How, then, can this court say that the Indians have been given the same rights as other citizens of Wisconsin, when control over any transfer of their lands is to be held in trust for a period of thirty years, and when the use to which the Menominees may put these lands is closely regulated by the provisions of the Termination Act, and the Menominee Indians' Assistance Trust. In effect, the

Menominee Indians have not received full status as citizens, and under the facts of the instant case, retain their inherent tribal hunting and fishing rights, which were assured to them in perpetuity under the terms of the treaties of 1848 and 1854. I would affirm the judgment of the trial court.