STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

John LEMIEUX, Defendant-Respondent. [Case No. 81–713.]

STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Peter LEMIEUX, Defendant-Respondent. [Case No. 81–714.]†

Supreme Court

*Nos. 81–713, 81–714. Argued November 29, 1982.—Decided January 5, 1983.*

(Also reported in 327 N.W.2d 669.)

† Motion for reconsideration denied, without costs, on February 15, 1983.

For the plaintiff-petitioner the cause was argued by *John D. Niemisto,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

There was a joint brief by *Michael F. Fauerbach* and *Santini, Jacobs, McDonald & Silc, P.C.,* Ashland, for John Lemieux; and by *Kathryn L. Tierney,* Wisconsin Judicare, Inc., Wausau, for Peter Lemieux, and oral argument by *Ms. Tierney.*

WILLIAM G. CALLOW, J.   This review arises out of a decision[1] of the court of appeals which affirmed an order of the Ashland County Circuit Court, Hon. Gary L. Carlson, Circuit Judge for Taylor County, presiding, which dismissed citations issued to John and Peter Lemieux for the violation of sec. 29.224(2), Stats.[2]

The parties have stipulated to the facts in this case. John and Peter Lemieux are both adult enrolled members of the Bad River Band of Lake Superior Chippewa. At approximately 12:50 a.m., on October 26, 1979, the Le-

---

[1] *State v. Lemieux,* 106 Wis. 2d 484, 317 N.W.2d 166 (Ct. App. 1981).

[2] Sec. 29.224(2), Stats., provides: "No person may possess, place or transport in or on any aircraft, vehicle or automobile any firearm, bow or crossbow unless such bow or crossbow is unstrung or enclosed within a carrying case or such firearm is unloaded and enclosed within a carrying case." This is a forfeiture action.

mieuxs were stopped on a public highway within the Bad River Reservation by two Wisconsin Department of Natural Resources (DNR) conservation wardens. In their truck, the Lemieuxs were carrying two loaded, uncased, high-powered rifles and one .357 caliber pistol. According to the stipulation of facts, the Lemieuxs were about to start hunting wild animals. The DNR wardens issued citations to John and Peter Lemieux for transporting loaded and uncased firearms in a vehicle in violation of sec. 29.224(2), Stats.

By stipulation these two cases were consolidated. The trial court dismissed the citations against the Lemieuxs on the ground that the state lacked jurisdiction to enforce them. Finding that sec. 29.224(2), Stats., was primarily a hunting regulation, the court reasoned that its enforcement against the Lemieuxs on their reservation would improperly infringe upon the hunting rights reserved to them by Treaty in 1854. The court of appeals affirmed but on different grounds. Rather than rely upon hunting rights, the court of appeals treated sec. 29.224(2) as a safety regulation. The court held that, absent a specific federal grant of jurisdiction, the state is presumed to be without jurisdiction over tribal Indians. After examining the bases for jurisdiction advanced by the state, the court of appeals concluded that the state was without authority to enforce sec. 29.224(2), Stats., against the Lemieuxs.

The issue presented for review is whether the state of Wisconsin has jurisdiction to enforce a violation of sec. 29.224(2), Stats., against enrolled members of the Bad River Band of Lake Superior Chippewa on a public highway located within the boundaries of the Bad River Reservation. We conclude that the enforcement of sec. 29.224 (2), Stats., against the Lemieuxs would be an impermissible infringement upon treaty-guaranteed hunting

rights.[3] Accordingly, the state is without jurisdiction to enforce the citations.

On September 30, 1854, at La Pointe, Wisconsin, the United States signed a Treaty with the Chippewa. 10 Stat. 1109 (1854). The Bad River Reservation was created by Article 2 of the Treaty which provides in pertinent part:

"The United States agree to set apart and withhold from sale, for the use of the Chippewas of Lake Superior, the following described tracts of land, viz:—

". . .

"2d. For the La Pointe band, and such other Indians as may see fit to settle with them, a tract of land bounded as follows: Beginning on the south shore of Lake Superior, a few miles west of Montreal River, at the mouth of a creek called by the Indians Ke-che-se-be-we-she, running thence south to a line drawn east and west through the centre of township forty-seven north, thence west to the west line of said township, thence south to the southeast corner of township forty-six north, range thirty-two west, thence west the width of two townships, thence north the width of two townships, thence west one mile, thence north to the lake shore, and thence along the lake shore, crossing Shag-waw-me-quon Point, to the place of beginning. Also two hundred acres on the northern extremity of Madeline Island, for a fishing ground."

The Treaty did not specifically confer hunting and fishing rights to the Chippewa. Nevertheless, it has been interpreted to grant such rights.[4] *State v. Johnson*, 212 Wis. 301, 311, 249 N.W. 284 (1933) (*overruled on other*

---

[3] Because this case may be resolved on the hunting rights issue alone, we need not reach the jurisdictional questions addressed by the court of appeals. We neither approve nor disapprove of the court of appeals' decision.

[4] Treaties which are ambiguous with respect to hunting and fishing rights have long been interpreted to accord such rights. *State v. Sanapaw*, 21 Wis. 2d 377, 382–83, 124 N.W.2d 41 (1963); *Menominee Tribe v. United States*, 391 U.S. 404 (1968).

grounds, *State v. Gurnoe,* 53 Wis. 2d 390, 405, 192 N.W. 2d 892 (1972)). "[T]he basic rule for interpreting Indian treaties is to determine what was the intent of the parties." *State v. Gurnoe,* 53 Wis. 2d 390, 403, 192 N.W. 2d 892 (1972). In order to help discern the parties' intent, treaties are to be construed liberally with ambiguities being resolved in favor of the Indians. *Id.; State v. Sanapaw,* 21 Wis. 2d 377, 382, 124 N.W.2d 41 (1963), *cert. denied,* 377 U.S. 991 (1964). Applying these principles, this court in *Gurnoe* found it unlikely that the Chippewa intended to give up their fishing rights in the 1854 Treaty.[5] Accordingly, we held that the language in Article 2 of the Treaty which provides that the United States shall set apart certain land "for the use of" the Chippewa extended fishing rights to them. 53 Wis. 2d at 400. Under the *Gurnoe* rationale the same Treaty language granted the Chippewa hunting rights.

The Supremacy Clause provides that a treaty with the Indians is the supreme law of the land (U.S. Const. art. VI, cl. 2),[6] and "the exercise of rights on reservation

[5] In reaching this conclusion, we relied in part upon our interpretation of a similar ambiguity in a treaty with the Menominee Tribe in *State v. Sanapaw, supra.* Although that treaty did not specifically confer hunting and fishing rights, we stated:

"It would seem unlikely that the Menominees would have knowingly relinquished their special fishing and hunting rights which they enjoyed on their own lands, and have accepted in exchange other lands with respect to which such rights did not extend. They undoubtedly believed that these rights were guaranteed to them when these other lands were ceded to them 'to be held as Indian lands are held.' Construing this ambiguous provision of the 1854 treaty favorably to the Menominees, we determine that they enjoyed the same exclusive hunting rights free from the restrictions of the state's game laws over the ceded land, which comprised the Menominee Indian Reservation, as they had enjoyed over the lands ceded to the United States by the 1848 treaty." 21 Wis. 2d at 383.

[6] The U.S. Const. art. VI, cl. 2, provides: "This constitution, and the laws of the United States which shall be made in pursu-

lands guaranteed to the tribe by the Federal Government would not be subject to state regulation, at least in absence of a cession by Congress." *Menominee Tribe v. United States,* 391 U.S. 404, 411–12 n. 12 (1968). Therefore, the state of Wisconsin may not qualify or condition hunting and fishing rights which were conferred to the Indians by treaty.[7] *Puyallup Tribe v. Dept. of Game,* 391 U.S. 392, 398–99 (1968).

The limitation on state jurisdiction with respect to treaty rights has long been recognized by the courts. In *In re Blackbird,* 109 F. 139 (D.C. W.D. Wis. 1901), a member of the Bad River Band of the Chippewa was arrested for violating a Wisconsin fish and game law on his reservation. In concluding that the state lacked authority to enforce the law, the court held:

---

ance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding."

[7] It must be noted that a line of United States Supreme Court cases have held that the state may regulate certain aspects of treaty-guaranteed hunting and fishing rights (*e.g.*, the manner of fishing or hunting, the size of the take, and the restriction of commercial hunting and fishing) "in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup Tribe v. Dept. of Game,* 391 U.S. 392, 398 (1968); *Washington Game Dept. v. Puyallup Tribe,* 414 U.S. 44 (1973); *Antoine v. Washington,* 420 U.S. 194 (1975); *Puyallup Tribe v. Washington Game Dept.,* 433 U.S. 165 (1977); *Washington v. Fishing Vessel Assn.,* 443 U.S. 658 (1979). In order to regulate such rights, however, the state must show that the regulation is a "reasonable and necessary conservation measure." 420 U.S. at 207. *State v. Gurnoe,* 53 Wis. 2d 390, 410, 192 N.W.2d 892 (1972). The state of Wisconsin has not argued, let alone established, that the enforcement of sec. 29.224(2), Stats., against the Lemieuxs is necessary for the conservation of wild animals. Therefore, the above cases are inapposite to the instant case.

"Congress might even provide fish and game laws to restrict the Indians in their natural and immemorial rights of fishing and hunting. But it has not seen fit to do so. It would be intolerable if the state, under these circumstances, should have the power to step in, and extend its civil and criminal codes and police power over these people. It would be an invitation to an early conflict of jurisdiction." *Id.* at 144.

*See also Moore v. United States,* 157 F. 2d 760 (9th Cir. 1946) ; *Leech Lake Band of Chippewa Indians v. Herbst,* 334 F. Supp. 1001 (D. Minn. 1971). Congress has also acknowledged this constraint on state jurisdiction. The United States Code grants certain states, including Wisconsin, jurisdiction over criminal offenses committed by Indians on Indian reservations. 18 U.S.C. sec. 1162 (1976). Congress, however, expressly limited that jurisdiction so as not to interfere with treaty-guaranteed hunting and fishing rights. 18 U.S.C. sec. 1162(b) (1976) provides:

"Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

Thus we conclude that the state is generally without jurisdiction to regulate the treaty-guaranteed right of the Chippewa to hunt and fish on their reservation.

The state, however, argues that hunting rights guaranteed by treaty do not extend to public rights-of-way run-

ning through the reservation. Therefore, because the Lemieuxs committed the offense on a public highway, the state contends it has jurisdiction to enforce the citations. We disagree. Rights-of-way running through Indian reservations are specifically designated as " 'Indian country' " by federal law. 18 U.S.C. sec. 1151 (1976) ;[8] *Ortiz-Barraza v. United States,* 512 F.2d 1176, 1180 (9th Cir. 1975). We are not persuaded that a right-of-way within a reservation is any different from other reservation land with respect to treaty-guaranteed hunting and fishing rights. Accordingly, we conclude the fact that the Lemieuxs' activities occurred on a public highway does not create an exception to the general prohibition against state infringement of hunting and fishing rights guaranteed by treaty.

Having determined that the 1854 Treaty with the Chippewa guarantees hunting rights and that the state generally cannot regulate such rights, we now turn to the specific question presented by this case: whether the state has jurisdiction to enforce sec. 29.224(2), Stats., against Indians on their reservation. This question does not turn on whether sec. 29.224(2) is primarily a hunting or safety regulation, as suggested by the trial court, but rather whether the enforcement of sec. 29.224(2) impermissibly infringes upon treaty-guaranteed hunting rights. The

---

[8] 18 U.S.C. sec. 1151 (1976) provides: "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the boarders [sic] of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

legislative purposes underlying the statute are instructive on this issue.

Sec. 29.224, Stats., proscribes three activities:

"(1) No person may possess, place or transport in or on a motor-driven boat while the motor is running any firearm, bow or crossbow unless the firearm is unloaded and unless the bow or crossbow is unstrung or enclosed within a carrying case.

"(2) No person may possess, place or transport in or on any aircraft, vehicle or automobile any firearm, bow or crossbow unless such bow or crossbow is unstrung or enclosed within a carrying case or such firearm is unloaded and enclosed within a carrying case.

"(3) No person may load, fire or shoot any firearm, crossbow or bow and arrow in, on or from any automobile, aircraft or vehicle, stationary or moving except as provided in s. 29.09(9)."

There is little doubt that the legislature had safety in mind when enacting this statute. The title of the section, "Safe use and transportation of firearms," although not part of the statute (sec. 990.001(6), Stats.), can be indicative of legislative intent. *State v. Mahaney*, 55 Wis. 2d 443, 449, 198 N.W.2d 373 (1972); *Pure Milk Products Coop. v. NFO*, 64 Wis. 2d 241, 253, 219 N.W.2d 564 (1974). The fact that sec. 29.224 has a safety purpose is not, however, dispositive. Statutes often have more than one purpose. We believe the legislature also intended to regulate hunting through sec. 29.224. Sec. 29.224 was enacted as part of Chapter 29 which is entitled, "Fish and Game." The title of a chapter can be evidence of legislative intent. *See Pure Milk Products Coop. v. NFO, supra.* Thus the placement of sec. 29.224 within Chapter 29 suggests that the legislature contemplated hunting control as an objective of the statute.

Furthermore, the exception to sec. 29.224(3), Stats., which allows a person to fire a weapon from a vehicle as provided in sec. 29.09(9), Stats., demonstrates a hunting regulation purpose. Sec. 29.09(9) provides:

"**Disabled Persons.** After proper application and presentation of a current hunting license duly issued to the applicant, the secretary may, after due investigation and without cost, grant a special permit to any person who is unable to walk and requires a wheel chair or prosthetic appliance for mobility, to shoot or hunt from a standing automobile or to hunt any deer, whether a buck or a doe, during the regular deer season, notwithstanding any other provision of this chapter to the contrary. Regardless of deer hunting party permit limits, any holder of a permit under this section may obtain a party permit deer tag without cost upon application in any area for which a party deer season has been established."

The exception to sec. 29.224, Stats., creates a special hunting privilege for disabled persons. It necessarily follows that the rule (sec. 29.224) regulates hunting activities; otherwise there would be no need for the exception. Moreover, if safety had been the legislature's only concern in enacting sec. 29.224, there would be no logical basis for the exception to subsection (3). Possessing, loading, or firing a weapon from a vehicle presents the same hazard to a disabled person as to a person without handicap. Therefore, it is evident that a legislative purpose underlying sec. 29.224 is the regulation of hunting.

The plain language of sec. 29.224, Stats., does in fact restrict the method of hunting. Since a loaded, uncased weapon cannot be possessed, transported in, or fired from a vehicle, sec. 29.224, in effect, prohibits hunting from a vehicle. We conclude that sec. 29.224 regulates hunting and that its enforcement against members of the Bad River Band of Lake Superior Chippewa on the Bad River Reservation impermissibly infringes upon their treaty-guaranteed hunting rights. Therefore, the state is without jurisdiction to enforce the citations against John and Peter Lemieux for the violation of sec. 29.224(2), Stats.

*By the Court.*—The decision of the court of appeals is affirmed.

BEILFUSS, C.J., took no part.